United States Court of Appeals,

Fifth Circuit.

No. 93-4381.

Robert A. AMATO, Petitioner,

v.

SECURITIES AND EXCHANGE COMMISSION, Respondent.

April 20, 1994.

Petition for Review of an Order of the Securities and Exchange Commission.

Before HIGGINBOTHAM and DUHÉ, Circuit Judges, and STAGG,[1] District Judge.

STAGG, District Judge.

Petitioner Amato seeks review of an order of the Securities and Exchange Commission ("SEC") affirming disciplinary action taken against him by the National Association of Securities Dealers, Inc. ("NASD"). Both the SEC and the NASD found that Amato had violated Article III, Sections 1 and 4 of the NASD's Rules of Fair Practice. Finding no error, we affirm.

### FACTS.

Robert Amato was a retail salesman and the branch manager of the New Orleans office of Brennan Ross Securities, Inc.[2] Brennan Ross had sold the majority of the initial public offering of the stock in Barclays West, Inc. ("Barclays"),[3] which closed around the

---

[1]District Judge of the Western District of Louisiana, sitting by designation.

[2]Brennan Ross is now defunct.

[3]Barclays was a highly speculative penny stock.

1

beginning of August 1989. During the three-month period following August of 1989, Brennan Ross handled more than ninety percent of all purchases and sales of Barclays stock. Ninety-five percent of the New Orleans office's business consisted of transactions in Barclays stock. The New Orleans office consisted of Amato and three other salesmen.

For each sale, the salesman was given a "wholesale," or "strike" quotation and an "offer" quotation by Brennan Ross' trading department. The salesman was given the discretion to sell the stock for any price between those two numbers, and his commission consisted of the difference between the wholesale price and the retail price. The salesman's salary was computed based on a percentage of his gross commissions.

During this three-month period, Amato purchased 445,650 shares from retail customers in seven transactions on behalf of Brennan Ross. He sold 1,052,550 shares to his retail customers in ninety-nine transactions. Almost eighty percent of his sales transactions were at markups which exceeded twenty percent, and more than sixty percent of the transactions were at markups that exceeded forty percent. Amato's transactions in Barclays yielded gross commissions of $93,999 over the three-month period following August, 1989, producing $65,799 in compensation for him.

NASD filed a complaint against Amato for selling the Barclays stock at an excessive markup, and the District Business Conduct Committee found that he had violated Sections 1 and 4 of the NASD's Rules of Fair Practice. Section 1 requires the observance of "high

2

standards of commercial honor and just and equitable principles of trade." Section 4 requires that prices charged in over-the-counter principal transactions with customers be "fair, taking into consideration all relevant circumstances...." Amato was fined $20,000 and suspended from trading for four weeks. NASD's National Business Conduct Committee affirmed the District Committee, and imposed an additional requirement that Amato requalify as a registered representative by examination after completion of his suspension. The Securities and Exchange Commission upheld this decision.

### *APPELLANT'S ARGUMENTS.*

Amato appeals this decision based on three arguments: 1) The SEC erred in applying Sections 1 and 4 of the NASD Rules of Fair Practice to impose liability on a salesman; 2) The SEC erred in applying an ex post facto interpretation to a rule of conduct; and 3) Amato's due process rights were violated because the punishment he received was excessive, and because he was the target of selective prosecution. This court will address each argument in turn.

*A. Do Sections 1 and 4 of the NASD Rules of Fair Practice impose liability on Amato?*

Amato argues that sections 1 and 4 of the Rules of Fair Practice promulgated by the NASD do not authorize a finding of liability for a salesman for excessive markups of stock. He argues that Sections 1 and 4 of the Rules of Fair Practice can not be interpreted to impose liability; rather, they are to be construed as aspirational guidelines. As mentioned earlier, Section 1 of

Article III of the Rules provides:

> A member, in the conduct of his business, shall observe high standards of commercial honor and just and equitable principles of trade.

*NASD Manual,* ¶ 2151.  Section 4 of Article III provides:

> In "over-the-counter" transactions ... if a member buys for his own account from his customer, or sells for his own account to his customer, he shall buy or sell at a price which is fair, taking into consideration all relevant circumstances....

*NASD Manual,* ¶ 2154.

Amato further argues that under the Rules of Fair Practice of the NASD Manual, it is the responsibility of the "member" of the NASD, i.e. Brennan Ross, rather than the salesman, to ensure compliance with applicable securities regulations.  The NASD rules indeed discuss compliance in terms of the "member's" actions, and require the member to formulate written supervisory procedures in order to ensure compliance with securities regulations.  Amato argues that his compliance with Brennan Ross' written procedures exempts him from any liability.  He also cites an excerpt from an interpretation by the Board of Governors, in support of his argument that Sections 1 and 4 of the Rules of Fair Practice are merely aspirational:

> The Board stated that it would be impractical and unwise, if not impossible, to define specifically what constitutes a fair spread on each and every transaction because the fairness of a markup can be determined only after considering all of the relevant factors.  Under certain conditions a markup in excess of 5 per cent may be justified, but on the other hand, 5 per cent or even a lower rate is by no means always justified.

NASD Manual—Rules of Fair Practice, Article III, ¶ 2154, Sec. 4, p. 2055 (1990), *Interpretations of the Board of Governors.*  Amato

4

suggests that the markup rule is a philosophy of business conduct subject to interpretation.  He argues that the rule imposed by his case is untenable, because it would require stockbrokers in satellite offices to question their home office regarding sales prices before each transaction.

However, the ruling of the Commission in Amato's case was not based solely on the wording of Sections 1 and 4.  Rather, the Commission found that Amato's "insider" position, in conjunction with his violation of the rule, rendered him liable.  The SEC specifically noted that Amato "was intimately involved in the pricing of these securities within parameters set by Brennan Ross' trading department."[4]  Further, Amato "had to be aware" that his commissions were a "suspiciously high percentage of the prices paid by customers."[5]  The Commission found that Amato's role in this incident was "especially troubling" because of the knowledge he possessed.  Because Amato was purchasing the stock from his customers and selling it to them, he was in a position to know the cost to Brennan Ross.  The majority of stock brokers are not in a position to have enough information and knowledge to be accountable for excessive commissions.  *See generally In re Langley-Howard, Inc.,* 43 S.E.C. 155, 1966 WL 3140, 1966 SEC LEXIS 186 (1966).  However, due to Amato's position as both buyer and seller of the Barclays stock, he was in possession of such knowledge.  The Commission also found that Amato should, "at a minimum, have

---

[4]SEC opinion at p. 4.

[5]SEC opinion at p. 4.

questioned the large markup between the Firm's "wholesale' quotes and the prices they were permitted to charge the public."[6] Moreover, the NASD Manual specifically provides that "persons associated with a member shall have the same duties and obligations as a member under these Rules of Fair Practice."[7]  Amato's arguments to the contrary are unpersuasive, and we affirm the Commission's ruling on this issue.

*B. Whether the Commission's conclusion that Article III imposed liability of Amato was an impermissible ex post facto application of the regulation?*

In its opinion affirming Amato's sanctions, rendered on March 10, 1993, the SEC cited its own opinion in *In re Willis H. Brewer, Jr.,* Security Exchange Release No. 34-31964, 1993 WL 71024, 1993 SEC LEXIS 499 (Mar. 9, 1993).  The *Willis Brewer* opinion found a registered representative liable for excessive markups in connection with the sale of stock.  Amato argues that the use of this case as precedent is an impermissible ex post facto application of law.  He maintains that a registered representative in 1989 can not be expected to anticipate a change of the law in 1993.

This argument is completely without merit.  While there are no cases before *Willis Brewer* holding a registered representative liable, none of the SEC cases preclude this possibility.  Amato argues that *In re Langley-Howard, Inc.,* 43 S.E.C. 155, 1966 WL

---

[6]SEC opinion at p. 6.

[7]*NASD Manual,* Article I, Section 5(a), PP2005 at 2011 (1993).

6

3140, 1966 SEC LEXIS 186 (1966) stands for the proposition that salesmen are not liable for excessive markups. However, the reasoning in that case was based on the fact that it was unclear whether the salesmen involved were put on notice that the markups they were charging were unfair. *In re Langley-Howard, Inc.,* 43 S.E.C. at 162, 1966 WL 3140, 1966 SEC LEXIS at 15. Implicit in the court's holding is that a registered representative could incur liability if he was on notice that the markup he was charging was excessive.

Secondly, the NASD Rules of Fair Practice were in force in 1989. Therefore, Amato was charged with knowledge of Article I, Section 5(a), which provided that "[p]ersons associated with a member shall have the same duties and obligations as a member under the Rules of Fair Practice." As a registered representative, he was obligated to comply with Sections 1 and 4 of the Rules of Fair Practice.

*C. Was Amato denied due process by the fact and extent of his punishment?*

Amato argues that the sanction imposed on him was excessive, and that he was the victim of selective prosecution by the SEC. Essentially, Amato's argument is that the SEC abused its discretion in imposing sanctions on him which were more severe than the sanctions received by the other members of his firm. Brennan Ross' head trader received a two-week suspension for his role in the incident, and he shared a joint fine of $15,000 with Brennan Ross' president. Amato argues that his punishment was clearly excessive in light of the punishment imposed on these two individuals.

7

We review the Commission's decision to impose this particular sanction on Amato for a gross abuse of discretion. *See Whiteside & Co., Inc. v. SEC,* 883 F.2d 7, 10 (5th Cir.1989); *Kane v. SEC,* 842 F.2d 194, 201 (8th Cir.1988); *Tager v. SEC,* 344 F.2d 5, 9 (2d Cir.1965). We can not say that the Commission's decision to fine Amato $20,000, suspend him for four weeks, and require him to requalify as a registered representative was a gross abuse of discretion. Furthermore, both Brennan Ross' head trader and its president settled the claims against them with the SEC. The Commission has stated that it will reward such decisions to settle when determining the sanctions to be imposed. *In re Blinder Robinson & Co.,* 48 S.E.C. 624, 636 n. 36 (1986), *vacated on other grounds,* 837 F.2d 1099 (D.C.Cir.1988). We conclude that the SEC was well within its discretion in imposing the sanctions on Amato.

Amato also argues that he was singled out to be punished by the SEC in this situation. He states that he received unfair treatment from the local NASD office from the beginning, and subsequently began to complain through letters, initially directed at the local NASD office. After not receiving a response to his inquiries, he ultimately contacted the chairman of the NASD and the acting director of the SEC. Amato provided copies of these letters to Brennan Ross' compliance department. He never received a response to any of his inquiries. The local security regulators voiced displeasure that Mr. Amato had written such letters. Brennan Ross assured the regulators that Mr. Amato would stop writing these letters. Amato was subsequently informed by Brennan

8

Ross that if he wrote another letter of complaint to the regulatory authority, his employment with Brennan Ross would be terminated. Amato contends that he indeed stopped writing the letters, and was consequently punished by the NASD.

In order to establish that he was unfairly prosecuted, Amato must establish that he was singled out for prosecution while others similarly situated were not, and that the action against him was motivated by an arbitrary or unjustifiable consideration, such as race, religion, or the desire to prevent the exercise of a constitutionally-protected right, such as freedom of speech. *See United States v. Collins,* 972 F.2d 1385, 1397 (5th Cir.1992), *cert. denied,* --- U.S. ----, 113 S.Ct. 1812, 123 L.Ed.2d 444 (1993); *United States v. Huff,* 959 F.2d 731, 735 (8th Cir.), *cert. denied,* --- U.S. ----, 113 S.Ct. 162, 121 L.Ed.2d 110 (1992); *C.E. Carlson, Inc. v. SEC,* 859 F.2d 1429, 1437 (10th Cir.1988). Amato has introduced no evidence which comes close to meeting his burden on this issue. Moreover, the Commission submitted a Memorandum which evidences that the NASD had no objection to Mr. Amato's letter-writing practices, as long as they did not interfere with the NASD's conducting its branch office examinations.[8] This evidence falls far below Mr. Amato's burden, and we find his claim to be without merit.

For the foregoing reasons, the judgment of the district court is AFFIRMED.

---

[8]Record at p. 1338.