**Robert Bruce ORKIN, Petitioner,**

**v.**

**SECURITIES AND EXCHANGE COMMISSION, Respondent.**

**No. 93–4415.**

United States Court of Appeals, Eleventh Circuit.

Sept. 13, 1994.

William Nortman, Nortman & Bloom, P.A., Mark Richard Dern, Miami, FL, for petitioner.

Securities & Exchange Com'n, Office of the Gen. Counsel, Jacob H. Stillman, Leslie E. Smith, Christopher Paik, Eric Summergrad, Securities & Exchange Com'n, Washington, DC, for respondent.

Before HATCHETT and EDMONDSON, Circuit Judges, and MELTON *, Senior District Judge.

MELTON, Senior District Judge:

Petitioner, Robert Bruce Orkin ("Orkin"), seeks review of an order of the Securities and Exchange Commission ("SEC") affirming disciplinary sanctions imposed by the National Association of Securities Dealers, Inc. ("NASD").[1] The NASD sanctioned Orkin for violations of Article III, Sections 1 and 4 of the NASD's Rules of Fair Practice ("Rules"). Specifically, the NASD and the SEC found that Orkin breached the NASD's 5% markup policy by charging retail customers excessive prices in sales of Ortech Industries, Inc. ("Ortech") stock occurring from October 20, to December 10, 1987.

Orkin asserts as grounds for review that: 1) the SEC's determination that the retail markups were excessive was not supported by substantial evidence; 2) the SEC improperly affirmed the NASD's finding of markup violations when it determined that the prevailing market price of Ortech stock was different from that noted in Schedule A to the NASD complaint and adopted by NASD conduct committees; 3) the SEC erred in holding him liable for the markup violations because he did not have final authority to set retail prices; 4) the SEC erred in determining that the NASD's markup policy is not unconstitutionally vague, illegal, or unfair, especially as applied to the facts of this case; and 5) the sanctions imposed against him are too severe. For the reasons set forth below, we find substantial evidence to support the SEC's findings of fact and we concur in its legal conclusions. Accordingly, we deny Orkin's petition for review, affirm the order of the SEC, and lift the stay.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. FACTS

Orkin was President of Ortech between November 1986, and August 1987. In May

---

* Honorable Howell W. Melton, Senior U.S. District Judge for the Middle District of Florida, sitting by designation.

1. The NASD is a self regulating organization. It commenced disciplinary action against Orkin by filing a complaint on January 27, 1989. The NASD's District Business Conduct Committee ("DBCC") then conducted an evidentiary hearing on the complaint on October 11, 1990, and issued an opinion on January 24, 1991. Orkin sought review by NASD's National Business Conduct Committee ("NBCC"). The NBCC reviewed the proceedings before the DBCC, conducted its own hearing on June 6, 1991, and issued an opinion on September 30, 1991. Orkin appealed the NBCC's decision to the SEC. The SEC made de novo determinations of fact and law. This court now reviews the SEC's Opinion and Order dated March 23, 1993. *See Shultz v. SEC*, 614 F.2d 561, 568 (7th Cir.1980).

1987, he entered into a written employment agreement with Tri–Bradley Investments, Inc. ("Tri–Bradley"), an NASD member with its home office in Denver, Colorado. Orkin was registered as an NASD general securities principal. He agreed to act as a retail salesman and branch manager for a Tri–Bradley branch office in Margate, Florida. Orkin was to pay all operating expenses for the Margate branch office. In exchange, he was entitled to commissions of 80% of the difference between the retail price and the base or "strike" price of securities sold.

Orkin's written employment agreement required him to conduct business under the "full and complete supervision" of the home office. He was required to submit all customer orders to the home office for approval and execution. In accordance with the terms of Orkin's employment agreement, Mary Frances Mernah, a Tri–Bradley officer and trader, and Paul Hurtado, Jr., another officer and Mernah's supervisor, reviewed and accepted Orkin's retail orders and executed the trades at the Denver home office.

In June 1987, while Orkin was still President of Ortech, Brownstone–Smith Securities Corp. ("Brownstone") was the sole underwriter for an initial public offering of Ortech common stock. Two types of warrants, which could be exercised to purchase common stock during a designated period of time at a specified price, were also offered for sale. The market for Ortech stock and warrants was not active or "thin." Brownstone was involved in the vast majority of interdealer as well as retail trades in Ortech securities.[2]

In October 1987, after leaving Ortech, Orkin negotiated with Brownstone to acquire Ortech warrants for Tri–Bradley. Tri–Bradley made three purchases of Ortech warrants between October 20, and December 10, 1987. Tri–Bradley was the sole purchaser of Ortech warrants during that period.

Between October 20, and December 10, 1987, Orkin solicited retail customers for Ortech common stock. Upon receiving a customer order, he would relay the customer's price to Mernah. Mernah then contacted market makers[3] in Ortech stock who were listed on the "pink sheets"[4] to obtain oral price quotations. There were no published quotations for Ortech stock during this period, although several firms listed themselves as market makers on the pink sheets. Pursuant to Tri–Bradley's policy, if the customer's price was within 5% of the lowest market maker quotation, Mernah accepted the order and executed the trade upon Hurtado's approval. Tri–Bradley was not a market maker in Ortech securities.

To obtain Ortech stock to fill Orkin's retail orders, Tri–Bradley exercised its Ortech warrants. Tri–Bradley's purchase and exercise cost of Ortech warrants was $.0175 per share of common stock. It charged Orkin's customers between $.035 and $.06 per share of Ortech stock, with only three sales occurring at $.035 and the vast majority of sales occurring at $.06.

In January 1989, the NASD filed a complaint against Hurtado, Mernah, and Orkin charging that they effected for Tri–Bradley and permitted Tri–Bradley to effect "over-the-counter sales of corporate securities to public customers, which transactions are described on Exhibit A [Schedule A] ... at prices which were not fair, taking into consideration all relevant circumstances."[5] Such unfair pricing violates the NASD 5% markup policy, an interpretation of Article III, Sections 1 and 4 of its Rules.

---

**2.** An NASD investigator testified at the DBCC hearing that he estimated that Brownstone was involved in 98% of all Ortech trades.

**3.** A market maker includes any dealer who, with respect to a security, buys from and sells to other dealers.

**4.** "Pink sheets" are the NASD's published interdealer quotation system. Pink sheets also list market makers for a given security.

**5.** The complaint was the fruit of an NASD investigation of Brownstone. The charge against Hurtado, along with a second charge, were withdrawn when he died before the DBCC hearing was held. Tri–Bradley, also named in the complaint, and Mernah submitted offers of settlement which were accepted by the NBCC. Tri–Bradley was censored, fined $118,000, and expelled from NASD membership. Mernah was fined $10,000 and suspended from acting in a NASD principal capacity for 90 days.

Schedule A identifies 208 retail sales of Ortech stock from October 20, through December 10, 1987, executed at prices of $.035 to $.06 at a cost of $.0175 to Tri–Bradley, resulting in markups of 100% to 243%.[6] These sales were solicited by Orkin and approved and executed by Mernah and Hurtado on behalf of Tri–Bradley. The markups were calculated using Tri–Bradley's cost to purchase and exercise the Ortech warrants as the best indicator of the prevailing market price for Ortech stock. Schedule A also lists eight inter-dealer trades of Ortech stock during that period: seven purchases by Brownstone at $.0175 to $.03 per share and a single sale by Brownstone at $.06.

## B. THE NASD PROCEEDINGS

After conducting an evidentiary hearing, the NASD District Business Conduct Committee ("DBCC") found that the sales identified on Schedule A were made in violation of the NASD's 5% markup policy. Because Tri–Bradley was not a market maker in Ortech securities, the DBCC used Tri–Bradley's cost of $.0175 to purchase and exercise Ortech warrants as the best evidence of the prevailing market price of Ortech stock. The resulting markups of 100% to 243% for the retail sales identified on Schedule A greatly exceed the 5% markup generally permitted under the NASD's policy and generated approximately $186,000 profit for Tri–Bradley.

The DBCC also concluded that despite language in his employment agreement requiring approval and execution of sales by Tri–Bradley's home office, Orkin played a predominant role in setting the retail price for Ortech stock. The DBCC thus found that Orkin violated Article III, Sections 1 and 4 of the NASD Rules. It imposed the following sanctions: censure, $50,000 fine, costs, and suspension from all NASD activity for thirty (30) days.

The NASD National Business Conduct Committee ("NBCC") upheld the DBCC's utilization of Tri–Bradley's cost in calculating the markups, but found that Orkin's participation in setting the retail price was limited.

Nevertheless, the NBCC found that his participation was sufficient to hold him responsible for the excessive markups because he had been involved in Tri–Bradley's purchase of Ortech warrants, as well as in the sales of Ortech stock to public customers. The NBCC upheld the DBCC's sanctions of censure and costs. However, it reduced Orkin's fine to $15,000, and imposed a 90 day suspension from NASD principal activities.

## C. THE SEC PROCEEDINGS

The SEC conducted a de novo review of the record and found that: 1) the markups on 201 sales of Ortech stock listed on Schedule A were excessive; 2) Orkin was liable for the markup violations; 3) the markup policy was not an illegal restraint of trade or otherwise illegal, unconstitutional, or unfair; and 4) the sanctions imposed against Orkin were appropriate. The SEC found that the record evidence established a higher prevailing market price for Ortech stock than that found by the NASD. The SEC used the price paid by Brownstone for Ortech stock it purchased from other dealers as the best evidence of the prevailing market price because Brownstone dominated and controlled the Ortech market during the relevant period. The prevailing market price as determined by the SEC resulted in smaller, but still excessive, markups for the sales listed on Schedule A.

In concluding that Tri–Bradley sold Ortech stock to retail customers at prices that greatly exceeded the prevailing market price, the SEC began with the long-standing premise that a firm's markups on a security must be reasonably related to its prevailing market price. *See, e.g., In re Alstead, Dempsey & Co., Inc.,* Securities Exchange Act Release No. 20,825 (April 5, 1984), 30 S.E.C. Docket 208, 1984 WL 50800, *1 (S.E.C.). The general rule is that when a dealer is not a market maker with respect to a security, absent countervailing evidence, the best evidence of the prevailing market price is the dealer's contemporaneous cost in acquiring the security. *E.g., Id.*

---

**6.** The opinions of the NASD and SEC refer to a high markup of *248 %.* As reflected on Schedule A, the correct figure is *243 %*

The NASD set the prevailing market price for Ortech stock at Tri–Bradley's cost of purchasing and exercising its warrants because it determined that Orkin failed to present countervailing evidence sufficient to establish a different prevailing market price and to prevent application of the general rule. The SEC, however, determined that countervailing evidence on the record supported a higher prevailing market price.

■ In addition to Tri–Bradley's retail sales, Schedule A identifies eight inter-dealer trades in Ortech stock, all involving Brownstone: seven purchases and one sale. In the seven sales, Brownstone paid no more than $.03 per share for Ortech stock.[7] Prices paid by a dominating and controlling market maker constitute evidence of prevailing market price. *In re Meyer Blinder,* Securities Exchange Act Release No. 31,095 (August 26, 1992), 52 S.E.C. Docket 1435, 1992 WL 216702, *2 (S.E.C.). The SEC thus concluded that the prevailing market price for Ortech stock was at most $.03 per share in the uncompetitive, thinly traded market. Accordingly, using a prevailing market price of $.03, the SEC computed retail markups ranging from 16.67% to 100% in 201 trades listed on Schedule A.[8] These markups still clearly exceed the 5% markup generally permitted under the NASD Rules.

The SEC held Orkin liable for the excessive markups because he played a significant role in pricing and was "at least grossly negligent in aiding Tri–Bradley in effecting retail sales of Ortech at excessive prices" because he had reason to believe that Ortech

stock prices had not risen to the level charged his customers.[9] The SEC found that Orkin breached his fiduciary duty to ensure that his customers were charged a fair price.

The SEC cited a number of facts indicating that Orkin knew or should have known the retail prices were excessive. Orkin was a NASD registered general securities principal and a Tri–Bradley branch manager who was familiar with the 5% markup policy and had to have an understanding of securities pricing. He had assisted Tri–Bradley in obtaining the Ortech warrants and therefore knew the cost Tri–Bradley would incur to fill his retail orders. Because he was involved in Ortech's initial public offering, Orkin also was in a position to know that Ortech stock was not actively traded and that Brownstone dominated and controlled the market. Moreover, Orkin suggested the prices his customers should offer.

The SEC opined that these facts, along with the fact that Orkin was entitled to a commission calculated on the basis of the retail price, rendered him more than a mere salesman or order taker with respect to the Ortech stock sales. The SEC thus refused to permit Orkin to abdicate his responsibility to his customers by hiding behind a formalistic employment agreement that gave the final authority to approve the price and execute the trade to the home office and deemed him responsible for the excessive markups.

The SEC dismissed Orkin's challenge to the NASD's markup policy as illegal, uncon-

---

**7.** The SEC gave Orkin the benefit of the doubt by setting the prevailing market price at $.03 because in fact, of the seven purchases by Brownstone, only the last was made at $.03 per share. The remaining purchases were made at $.0175 to $.0275 per share.

**8.** The SEC again gave Orkin the benefit of the doubt as to seven of the 208 trades listed on Schedule A. In support of his position that the unpublished quotations obtained by Mernah were the best evidence of Ortech's prevailing market price, Orkin pointed to three inter-dealer trades not involving Brownstone that occurred after the relevant time period: on December 16 and 17, 1987, at $.07 and on January 26, 1988, at $.05. While noting that Brownstone's domination and control affected all inter-dealer trades rendering them unreliable for establishing the

prevailing market price and that these trades occurred after the relevant time period, the SEC used the two $.07 trades to set the prevailing market price for Ortech stock five business days before they occurred. *See, e.g., In re Nicholas A. Codispoti,* 48 S.E.C. 842, Securities Exchange Act Release No. 24,946 (September 29, 1987), 39 S.E.C. Docket 312, 1987 WL 112824, *2 (S.E.C.). As a result, the markups on seven sales by Tri–Bradley were considered not excessive.

**9.** Orkin raises the argument in his brief that the SEC erred in finding that he "aided and abetted" Tri–Bradley's markup violations. In the context of its opinion, the SEC's use of the word "aided" does not connote a finding of such liability. We do not address this argument further as the SEC determined that Orkin was liable as a principal with regard to the markup violations.

stitutionally vague, and unfair, pointing out that no SEC or court decision has so found. On the contrary, the SEC and federal court decisions have rejected such challenges. The SEC relied on its decision in *In re Meyer Blinder,* Securities Exchange Act Release No. 31,095 (August 26, 1992), 52 S.E.C. Docket 1435, 1992 WL 216702, *3, *6–*8 (S.E.C.), finding that the NASD markup policy does not violate the purpose of the amended Exchange Act nor the requirement that NASD Rules be approved by the SEC, and is not an illegal restraint of trade or unconstitutionally vague. *See also, e.g., Handley Inv. Co. v. SEC,* 354 F.2d 64, 66 (10th Cir.1965) ("The statement of the 5% Policy establishes sufficient guidelines [to withstand a due process challenge]."); *Ross Sec., Inc.,* 40 S.E.C. 1064 (1962), Securities Exchange Act Release No. 3,628 (March 28, 1962); 1962 WL 3628, *2 (S.E.C.)). In addition, the SEC noted that the markup policy does not conflict with antitrust laws; rather, a repeal of the federal antitrust laws has been inferred where necessary to promote the purposes of the securities laws. *See, e.g., United States v. NASD,* 422 U.S. 694, 729–30, 734, 95 S.Ct. 2427, 2447–48, 2450, 45 L.Ed.2d 486 (1975).

Orkin also attempted to convince the SEC that because of the unique factual situation presented, the markup policy did not give sufficient notice that the markups at issue would be considered excessive, precluding fair application of the markup policy to his case. Orkin claimed that no reported cases discuss application of the markup policy where a dealer exercises warrants in order to fill retail orders or where evidence of another dealer's domination and control provides the basis for calculating the prevailing market price. The SEC found, however, that the NASD proceedings were conducted fairly and that the markup policy was fairly applied on the facts of the case.

The SEC specifically concluded that the evidence of Brownstone's domination and control of the Ortech market was properly considered as a factor in evaluating the fairness of Tri–Bradley's retail prices. With respect to a firm that is not a market maker in a security, the NASD markup policy creates a presumption that a dealer's contempo-

raneous cost is the best evidence of the prevailing market price, in the absence of countervailing evidence. Tri–Bradley's cost was its purchase and exercise price of Ortech warrants. Before the NASD, Orkin asserted that the unpublished phone quotations obtained by Mernah were countervailing evidence of Ortech stock's prevailing market price. He also pointed to the single interdealer sale by Brownstone listed on Schedule A, as well as to the three other inter-dealer trades outside the relevant period, to support the reliability of the oral quotations.

The SEC observed that the NASD countered Orkin's position by asserting that the oral quotations were unreliable because the Ortech market was not active and independent; it was dominated and controlled by Brownstone during the period. The interdealer trades listed on Schedule A, all involving Brownstone, evidence its domination and control. Brownstone's domination and control was asserted by an NASD investigator at the DBCC hearing. Orkin had ample opportunity to rebut that evidence before the NASD and SEC. The SEC considered Brownstone's domination and control a factor necessarily and appropriately taken into consideration in establishing the prevailing market price for Ortech stock under SEC precedent. As a result, the SEC concluded that the NASD erred to the extent that it ignored such evidence and relied solely on Tri–Bradley's cost to establish the prevailing market price.

The SEC further opined that the sanctions assessed against Orkin by the NBCC were not excessive, even when compared with those imposed against Mernah. The SEC noted that the sanctions against Mernah were imposed in the context of settlement and that merely because Orkin's sanctions were more severe does not render them excessive. *See Butz v. Glover Livestock Commission Co.,* 411 U.S. 182, 185–87, 93 S.Ct. 1455, 1457–59, 36 L.Ed.2d 142 (1973) (sanctions imposed within the authority of an administrative agency are not rendered invalid because they are more severe than those imposed in similar cases).

Moreover, the SEC found that Orkin's conduct merited the sanctions imposed. The

SEC observed that Orkin was in possession of all the key information, perhaps more information than Mernah, to determine whether Tri–Bradley's pricing was fair and that he participated in the pricing with respect to the Ortech stock sales. The SEC affirmed the NBCC sanctions of censure, $15,000 fine, costs, and 90 day suspension based upon Orkin's serious disregard for the NASD's pricing policy. Orkin then filed this petition for review.

## II. ANALYSIS

█ The SEC's factual findings must be affirmed if supported by substantial evidence. 15 U.S.C. § 78y(a)(4) (1988). This Court conducts a de novo review of the SEC's legal conclusions.

### A. MARKUP VIOLATIONS

█ Orkin poses a two-pronged challenge to the SEC's finding of markup violations on the facts of this case. He first asserts that the evidence was insufficient to support the SEC's finding of excessive markups. His second challenge is that when the SEC rejected the prevailing market price utilized by the NASD, as reflected on Schedule A, it should have determined that the violations as charged were not supported. According to Orkin, by calculating the prevailing market price differently, the SEC in effect required him to defend against a new charge.

The NASD adopted its 5% markup policy as an interpretation of Article III, Sections 1 and 4 of the NASD Rules. *Handley Inv. Co. v. SEC*, 354 F.2d 64, 65 (10th Cir.1965). Section 1 requires NASD members to observe "high standards of commercial honor and just and equitable principals of trade." Section 4 requires that prices charged retail customers be "fair, taking into consideration all relevant circumstances . . . ." Five percent is merely a guideline; larger markups may be justified in some situations, while in other situations, lesser markups may be excessive. *Id.*

The SEC reviewed its markup policy in, *In re Alstead, Dempsey & Co., Inc.*, Securities

Exchange Act Release No. 20,825 (April 5, 1984), 30 S.E.C. Docket. 208, 1984 WL 50800, *1 (S.E.C.), noting that "[a]s early as 1939, this Commission [the SEC] held that a dealer violates antifraud provisions when he charges retail customers prices that are not reasonably related to the prevailing market price at the time the customers make their purchases."[10] Under the NASD's policy, a markup of no more than 5% above the prevailing market price generally is considered fair. The SEC has consistently held that a markup of more than 10% in the sale of equity securities is unfair or fraudulent. *See, e.g., In re LSCO Sec., Inc.*, Securities Exchange Act Release No. 28,994 (March 21, 1991) 48 S.E.C. Docket 681, 1991 WL 296502, *2 (S.E.C.). The key issue in markup cases thus is determining the prevailing market price for the security at issue.

█ The prevailing market price is the price at which dealers trade with one another. *See, e.g., Alstead, Dempsey*, 30 S.E.C. Docket 208, 1984 WL 50800 at *1. The general rule is that in the absence of countervailing evidence, the best evidence of prevailing market price is the dealer's contemporaneous cost, unless a dealer is simultaneously making a market in a security. *See, e.g., F.B. Horner & Associates v. SEC*, 994 F.2d 61, 63 (2d Cir.1993); *Barnett v. United States*, 319 F.2d 340, 344 (8th Cir.1963); *LSCO Sec.*, 48 S.E.C. Docket 681, 1991 WL 296502 at *1; *Alstead, Dempsey*, 30 S.E.C. Docket 208, 1984 WL 50800 at *2. The general rule reflects the fact that prices a dealer has actually paid for a security in transactions occurring at the same time as retail sales are normally a highly reliable indicator of the prevailing market price. *Alstead, Dempsey*, 30 S.E.C. Docket 208, 1984 WL 50800 at *1.

█ Where a market maker is involved, markups may be computed using the price charged by the firm or other market makers in actual sales to other dealers. *See, e.g., LSCO Sec.*, 48 S.E.C. Docket 681, 1991 WL 296502 at *3; *Alstead, Dempsey*, 30

---

10. "[A] dealer may not exploit the ignorance of his customer to extract unreasonable profits resulting from a price which bears no reasonable relation to the prevailing price." *Duker & Duker*, 6 S.E.C. 386, 388–89 (1939).

S.E.C. Docket 208, 1984 WL 50800 at *2. However, the nature of the inter-dealer market must be reviewed to determine if it can serve as a reliable basis to set the prevailing market price. *Alstead, Dempsey*, 30 S.E.C. Docket 208, 1984 WL 50800 at *2. For example, if a dealer dominates and controls the inter-dealer market for a security, the best evidence of prevailing market price is the price that the dominating and controlling dealer is willing to pay other dealers. *E.g. In re Meyer Blinder*, Securities Exchange Act Release No. 31,095 (August 26, 1992), 52 S.E.C. Docket 1145, 1992 WL 216702, *2 (S.E.C.). Where an integrated [11] dealer, dominates the market to the extent that there is no independent, competitive market, it controls wholesale prices absent evidence to the contrary. *Id.* at *3. Thus, the price a dominating and controlling dealer pays for a security is the best evidence of the inter-dealer market and therefore the prevailing market price. *Id.* at *4.

 A dealer charged with markup violations may prevent application of these general rules by presenting countervailing evidence that another measure is better evidence of prevailing market price. Nevertheless, the use of quotations to establish the prevailing market price, as urged by Orkin in this case, is widely recognized as problematic. *See, e.g., LSCO Sec.*, 48 S.E.C. Docket 681, 1991 WL 296502 at *3; *Alstead, Dempsey*, 30 S.E.C. Docket 208, 1984 WL 50800 at *2. As an initial matter, quotations merely propose a transaction, they do not represent an actual sale. *Id.* Quotations for obscure securities with limited inter-dealer trading activity have particularly little value as evidence of the current market. *Id.* Conversely, published quotations are reliable indicators of prevailing market price only if there is an active, viable market for the stock. *Id.*

 We must concur with the SEC's application of its precedent on the facts of this case. The fact that Brownstone dominated and controlled the Ortech market is a relevant circumstance in determining whether the retail prices Tri–Bradley charged were fair, even though Tri–Bradley was not a market maker in Ortech stock. Throughout the NASD and SEC proceedings, Orkin himself argued the unfairness of ignoring prices paid by other dealers, and of strictly using Tri–Bradley's contemporaneous cost as the best evidence of prevailing market price. Orkin attempted to present countervailing evidence justifying the use of the unpublished quotations obtained by Mernah from Ortech market makers as evidence of the prevailing market price. He maintained that the quotations Mernah obtained were validated by a single inter-dealer sale of Ortech stock by Brownstone shown on Schedule A and three inter-dealer sales after the relevant period. Orkin cannot have it both ways.

Applying well-established precedent, the SEC found that the unpublished quotations and the single sale by Brownstone during the relevant period were not indicative of the prevailing market price for Ortech stock. There is no question that quotations are unreliable for assessing the prevailing market price in a thinly traded, obscure market. The single sale by Brownstone does not evidence the reliability of the quotations in this case because Brownstone dominated and controlled the Ortech market; it could charge any price it wanted for Ortech stock due to the purchasing dealer's lack of bargaining power.

 When a dealer dominates the market to the extent that it controls wholesale prices, the only reliable basis for determining prevailing market price is the price the dominating dealer is willing to pay other dealers. *See, e.g., Alstead, Dempsey*, 30 S.E.C. Docket 208, 1984 WL 50800 at *3. The record amply demonstrates that the market for Ortech stock was non-competitive and thinly traded in that Brownstone was involved in all inter-dealer trades during the relevant period and the vast majority of all trades in Ortech stock. As a result, prices paid by other dealers are not reflective of the prevailing market price. We conclude that sufficient evidence supports the SEC's finding that 201 sales of Ortech stock listed on Schedule A were executed in violation of the NASD's 5% markup policy because the prevailing price for Ortech stock was no higher than $.03 per

---

**11.** An integrated dealer is a market maker who also sells the security in the retail market.

share: the highest price paid by Brownstone during the relevant period.

The SEC's determination did not amount to a new charge against Orkin. Discerning the prevailing market price and computing the resulting markup for any retail stock sale must be done on a case by case basis. Accordingly, the nature of the violations charged in the NASD complaint placed Orkin on notice that all relevant circumstances would be considered. The SEC based its finding of markup violations on evidence in the record since the initial hearing before the DBCC. This Court cannot ascribe as error the SEC's consideration of sales by a dominating and controlling dealer during the relevant period. We find that the SEC appropriately and fairly applied its precedent to the facts before it in concluding that the markups charged in 201 sales of Ortech stock listed on Schedule A were unfair.

### B. ORKIN'S LIABILITY FOR MARKUP VIOLATIONS

 Orkin has maintained throughout these proceedings that he had no responsibility or authority to set the retail price for Ortech stock because his employment agreement with Tri–Bradley permitted him to conduct securities business only under the complete supervision of the Denver home office. He claims that his employment agreement rendered him a mere order taker for the home office, which retained sole authority to set retail prices and execute trades. He asserts that as a result, he appropriately relied on his superiors, Mernah and Hurtado, to comply with the NASD pricing rules.

The Fifth Circuit Court of Appeals recently rejected the argument that stock brokers or salesmen are exempt from responsibility for fair pricing under Sections 1 and 4 of the NASD Rules. *Amato v. SEC,* 18 F.3d 1281

(5th Cir.) *cert. denied,* ⸺ U.S. ⸺, 115 S.Ct. 316, ⸺ L.Ed.2d ⸺ (1994). We adopt the Fifth Circuit's reasoning in *Amato.* As an initial matter, anyone associated with a NASD member firm has the same duties and obligations as the firm under the Rules. *Id.* at 1284.

 The *Amato* court concurred with the SEC's finding that the salesman was liable for charging excessive markups because he was intimately involved in the pricing of securities within the parameters set by his firm's trading department. *Id.* at 1283. Moreover, because the salesman purchased stock from customers which he then resold to other customers, he was in a position to know the firm's cost, unlike many stock brokers. *Id.* This knowledge, similar to that possessed by Orkin in this case, was the key to the salesman's liability. Furthermore, a salesman cannot absolve himself of responsibility for compliance with the NASD Rules simply by relying on the directives of his superiors. *In re Dan King Brainard,* 47 S.E.C. 991, Securities Exchange Act Release No. 20,408 (November 22, 1983), 29 S.E.C. Docket 268, 1983 WL 35834, *4 (S.E.C.).

 The SEC's finding that Orkin was liable for markup violations because he knew or should have known that the retail prices were excessive is amply supported by the record. Orkin's knowledge concerning the Ortech market and Tri–Bradley's cost to acquire Ortech stock put him in a position to know that the prices Tri–Bradley charged his customers were excessive. He also should have known that because the Ortech market was obscure and thinly traded that quotations were an unreliable basis upon which to calculate markups.[12] In addition, Orkin solicited the orders and participated in the pricing of Ortech stock by suggesting prices his customers should offer.[13] He also stood

---

12. Using quotations unsubstantiated by a dealer's own sales to calculate markups displays at a *minimum reckless indifference to the duty owed to customers. In re Adams Sec., Inc.,* Securities Exchange Act Release No. 34,028 (May 9, 1994); 56 S.E.C. Docket ⸺, 1994 WL 186827, *3 (S.E.C.).

13. At the DBCC hearing, Orkin testified that he based the prices he suggested to customers on

conversations with brokers on the street. At the NBCC hearing, Orkin claimed that each day Mernah supplied him with quotations for various stocks and that the Ortech prices he suggested were based on information she supplied. In either case, Orkin is still responsible for the markup violations. *Orkin should have known that quotations were an unreliable indicator of the prevailing market price for Ortech, especially when they were 100% to 243% above the cost*

to benefit from the sales in the form of commissions based on the retail price. Because of his knowledge and involvement, Orkin abrogated his fiduciary responsibility to his customers by standing by while they were charged exorbitant prices. The SEC did not err in holding Orkin liable for excessive markups.

## C. LEGALITY OF THE MARKUP POLICY

▮▮▮ Orkin asserts that the markup policy 1) is illegal under federal anti-trust laws in that it results in price fixing and unduly restrains trade; 2) has never been approved in accordance with the Administrative Procedures Act; 3) is based on an antiquated survey of dealer pricing practices and its enforcement is arbitrary and capricious; and 4) as administered, is so difficult to comply with that it is rendered unconstitutional.

In *Meyer Blinder*, 52 S.E.C. Docket 1145, 1992 WL 21607, *3, *6–*8, the SEC considered the arguments that the NASD markup policy violates the Exchange Act, the antitrust laws, and the Administrative Procedures Act as well as the assertions that the policy is unconstitutionally vague, arbitrary, and capricious. For the reasons set forth in that opinion as well as those cited by the SEC in its opinion [14], we concur with the SEC's conclusion that the NASD's markup policy is not illegal, unfair, or unconstitutional as applied to the facts of this case or otherwise.

We are similarly unpersuaded by Orkin's argument that the markup policy is unfair because no reported cases involve similar facts. Specifically, Orkin notes that no published decision addresses markups where a dealer exercises warrants to fill retail orders or where the market of a security is dominated and controlled by a party not charged in the complaint. As a result, Orkin argues that he did not have adequate notice of the

rules he was required to abide by as an NASD member.

While we have been unable to locate a decision involving the precise factual situation before us, none of the SEC cases that Orkin has cited or that we have reviewed preclude the SEC's findings.[15] The markup policy is clear, well-established, and capable of being fairly applied to the facts of this case. Orkin had sufficient notice that the NASD Rules prohibited his conduct in this case. By its definition, the markup policy must be applied case-by-case and all relevant circumstances must be considered in determining the prevailing market price for a security and whether a fair retail price has been charged. For the reasons set forth above, we cannot find that the SEC unfairly or improperly concluded that Orkin was responsible for excessive markups in 201 retail sales of Ortech stock. These arguments by Orkin do not warrant reversal of the SEC's order.

## D. SEVERITY OF SANCTIONS

▮▮▮ Finally, Orkin claims that the sanctions imposed against him were too severe. He compares the sanctions assessed against him with those imposed on Mernah, who he asserts had greater responsibility for setting retail prices at Tri–Bradley.

▮▮▮ We may overturn the SEC's decision to impose a particular sanction only upon finding a gross abuse of discretion. *See, e.g. Amato*, 18 F.3d at 1284. Although the SEC found that fewer transactions violated the markup policy than the NASD, the sanctions imposed were not related to the excessiveness of the markups or to the number of transactions. The SEC found that Orkin's blatant disregard for the NASD markup policy was the overriding consideration in penalizing him. We agree.

Tri–Bradley would incur to obtain stock to fill his orders.

**14.** *In re Robert Bruce Orkin*, Securities Exchange Act Release No. 32,035, 53 S.E.C. Docket 1963 (May 23, 1993); 1993 WL 89023, *4 (S.E.C.).

**15.** The cases cited by Orkin are inapposite. For example, unlike the SEC panel in *In re Kevin B. Waide*, Securities Exchange Act Release No. 30,-561 (April 7, 1992), 51 S.E.C. Docket ___, 1992 WL 90342 (S.E.C.), the SEC panel in this case did not announce a new rule to govern future markup cases involving a particular factual situation.

The fact that Mernah settled with the NASD justifies the slightly lesser sanctions imposed upon her. The SEC has stated that it will reward settlement in determining sanctions and the Court finds no abuse of discretion in such practice. *See Amato*, 18 F.3d at 1284. We cannot conclude that the SEC's decision to affirm the sanctions imposed by the NASD was a gross abuse of discretion.

## CONCLUSION

For the foregoing reasons, Orkin's petition for review is DENIED, the SEC's order is AFFIRMED, and the stay is lifted.