**GENERAL BOND & SHARE CO., Petitioner,**

v.

**SECURITIES AND EXCHANGE COMMISSION, Respondent.**

No. 93–9545.

United States Court of Appeals, Tenth Circuit.

Oct. 27, 1994.

John Henry Schlie of Cross, Schlie & Heckenback, P.C., Englewood, CO., for petitioner.

Randall W. Quinn, Sr. Litigation Counsel, S.E.C., Washington, DC (Simon M. Lorne, Gen. Counsel, Eric Summergrad, Principal Asst. Gen. Counsel, and Angel Yang, Attorney, with him on the briefs) for respondent.

Before BRORBY and McWILLIAMS, Circuit Judges, and BROWN,* District Judge.

WESLEY E. BROWN, District Judge.

Petitioner General Bond & Share Company ("General Bond") seeks review of disci-

---

* The Honorable Wesley E. Brown, United States District Senior Judge for the District of Kansas, sitting by designation.

plinary action taken against it by the Securities and Exchange Commission (hereinafter "the Commission" or "SEC"). The Commission found that General Bond violated several Rules of Fair Practice of the National Association of Securities Dealers, Inc. ("NASD"), of which General Bond was a member. Specifically, the Commission determined that General Bond, through its president Samuel C. Pandolfo, acted improperly in accepting compensation from approximately forty-five issuers of securities in exchange for publicly listing General Bond as a wholesale dealer for the securities, that it failed to maintain current information in its files as required by Commission rules, and that it failed to respond fully to requests for information made by NASD in the course of its investigation of General Bond.[1] General Bond now asks this court to vacate the sanctions imposed by SEC.

## I.

*Regulatory Background.* The NASD is registered with SEC as a securities association pursuant to Section 15A of the Securities Exchange Act of 1934, 15 U.S.C. § 78o–3. As such, the NASD is responsible for self-regulation of its members, subject to oversight by SEC. *Id.* NASD is required to adopt rules regulating the conduct of its members and to enforce those rules through disciplinary proceedings. *Id.* Under NASD procedures, the NASD Market Surveillance Committee ("MSC") brings disciplinary actions concerning member violations. Any final action taken by the MSC is subject to review by the NASD's National Business Conduct Committee ("NBCC"), which may affirm, reverse or modify the action taken by the MSC.

Disciplinary action taken by the NASD is subject to review by SEC. 15 U.S.C. § 78s(d)(2). In such cases, SEC conducts a *de novo* review of the record and makes its own finding as to whether the conduct in question violated the NASD rule charged. 15 U.S.C. § 78s(e)(1). *See also Sorrell v. SEC,* 679 F.2d 1323, 1326 n. 2 (9th Cir.1982).

The SEC may also modify or cancel the sanctions imposed if it finds them to be excessive or oppressive. 15 U.S.C. § 78s(e)(2).

A person aggrieved by a final order of SEC in such a case may obtain review of the order in the appropriate U.S. Court of Appeals. § 78y(a)(1). A court reviewing the order must uphold the factual findings of SEC if they are supported by substantial evidence. § 78y(a)(4).

## II.

*Facts.* The following facts, which were adopted by SEC, are supported by substantial evidence in the record. *See* § 78y(a)(4). General Bond, located in Denver, Colorado, has been an NASD member since 1961. At all times relevant to this case, General Bond was a one-man broker/dealer owned and operated by its president, Samuel C. Pandolfo. General Bond was a wholesale trader which dealt only with "Pink Sheet" securities. It had no retail customers.

The "Pink Sheets" are published on a daily basis by the National Quotation Bureau, Inc. They contain broker-dealer submitted "bid" and "ask" prices for, or indications of interest in, specified securities. During the periods December, 1988 to July, 1990 and November, 1990 to January, 1991, General Bond received a total of $25,750 from about forty-five issuers in return for General Bond entering its name in the pink sheets as a "market maker" for the securities. A "market maker" includes any dealer who, with respect to a security, holds himself out (by entering quotations in an inter-dealer communications system or otherwise) as being willing to buy and sell such security for his own account on a regular and continuous basis. *See* 15 U.S.C. § 78c(a)(38). General Bond normally charged a negotiable fee for an individual listing, ranging between $250 and $1,000. The amount negotiated depended, according to Mr. Pandolfo, upon "supply and demand."

General Bond commanded these fees for at least ten years; in 1989 and 1990 about 25% of the firm's revenues consisted of such is-

---

1. The NASD also took disciplinary action against Mr. Pandolfo individually. Mr. Pandolfo died after an application for review of those sanctions had been filed with the SEC. The Commission subsequently dismissed the disciplinary action against Mr. Pandolfo.

suer-paid compensation. Pandolfo testified that the firm could not have stayed in business during 1989 and 1990 without these payments. He acknowledged that General Bond did not list issues based on expectations or promises of order flow and that potential trading activity was unimportant to him. If trading interest surfaced, General Bond would continue the listing; if not, the listing would be pulled. Sixteen of the issues identified in the complaint were listed by General Bond for periods of less than thirty days.

The NASD contacted Mr. Pandolfo in September of 1990 concerning applications he had filed to have General Bond listed in the pink sheets as a market maker for two stocks. At that time, the NASD staff advised Pandolfo that NASD member firms were prohibited from accepting issuer-paid compensation for making a market in a security. NASD staff also furnished Pandolfo with a NASD Notice to Members, issued in February 1975, which set forth NASD's position on the matter of issuer-paid compensation. Thereafter, Pandolfo agreed to refund $500 he had received from an issuer and to accept no further issuer-paid compensation. Despite these representations, Pandolfo did not refund the money and General Bond continued its practice of accepting compensation for entering the pink sheets.

In mid-March 1991, NASD staff requested that Pandolfo furnish documentation concerning issuer-paid compensation the firm received between July, 1990 and the date of the request. Pandolfo furnished documentation for the period December, 1990 through March of 1991, but did not provide the pre-December 1990 documentation requested.

### III.

The disciplinary action against General Bond was initiated by the filing of two separate complaints which were consolidated for purposes of the hearings before NASD and SEC. The first complaint alleged that General Bond violated Article III, Section 1 of the NASD Rules of Fair Practice, by accepting payments totaling $23,250 from issuers in return for listing itself as a market maker for the securities in the pink sheets during the

period December, 1988 to July, 1990. Article III, Section 1 states: "A member, in the conduct of his business, shall observe high standards of commercial honor and just and equitable principles of trade." The complaint further alleged a violation of Section 15(c) of the 1934 Act and Rule 15c2–11 promulgated thereunder, which requires a broker-dealer who has submitted a quotation or an indication of interest in a security to maintain current information on the issuer. The second complaint alleged a violation of Article III, Section I by virtue of General Bond's receipt of $2,500 in return for listing itself as a market maker for securities between November, 1990 and January, 1991, and by virtue of the fact that Mr. Pandolfo was notified that NASD considered such payments improper and represented to NASD that he would cease accepting such compensation but continued to accept payments. The second complaint also alleged that General Bond failed to produce documents requested by NASD in the course of its investigation and that such failure was a violation of Article III, Section 1 and Article IV, Section 5 of the Rules of Fair Practice. Following a hearing and decision before the NASD Market Surveillance Committee, NASD's National Business Conduct Committee determined on appeal that General Bond had engaged in the conduct alleged and found such conduct to be violations of NASD Rules of Fair Practice. NASD imposed sanctions consisting of fines, costs, and expulsion from membership in the association.

General Bond then sought a hearing before SEC. After that hearing, the Commission determined that General Bond's practice of accepting compensation for listing General Bond in the pink sheets as a market maker violated Article III, Section 1 of NASD's Rules of Fair Practice. The Commission noted that the typical market maker is compensated by trading for its own account and that, in deciding whether to list a stock in the pink sheets, the typical market maker is concerned with factors that affect the stock's liquidity and the security's intrinsic value. In contrast, General Bond's primary motivation in listing stocks was the payment that it received to list the security. According to

the findings of the Commission, market participants view a pink sheet listing as an indicia of some measure of liquidity in the market and of the listing broker-dealer's interest in buying or selling the security. Market participants, the Commission found, had no way to know that General Bond was indifferent to the market factors likely to affect trading profits. The Commission concluded that General Bond's practice of accepting compensation "compromised the integrity of the market and misled market participants." The Commission further found that General Bond violated Article III, Section I by telling NASD that it would cease accepting issuer-paid compensation and then continuing to command such fees. The SEC adopted NASD's finding that Mr. Pandolfo "deceived the staff by claiming that he had ceased accepting such listing fees, while continuing business as usual." The Commission also held that General Bond violated Rule 15c2–11 by failing to maintain reasonably current information in its files on two issuers. Finally, SEC concluded that General Bond's failure to produce documents requested by NASD was not excusable and was a violation of the Rules of Fair Practice.

The SEC approved the sanctions levied by NASD with one exception. A majority of the Commission determined that an "additional remedial fine" of $14,250 imposed by NASD was not appropriate. Otherwise, the Commission upheld the NASD's imposition of censure and expulsion from the association as well as a total fine of $45,750 for the violations committed by General Bond.

## IV.

1. *Article III, Section 1—Acceptance of Compensation by a Market Maker.* We first examine two related arguments asserted by General Bond. These arguments concern the Commission's determination that General Bond violated Article III, Section 1 of NASD Rules of Fair Practice by accepting compensation for listing General Bond in the "Pink Sheets" as a market maker for the securities. The first argument asserts that Article III, Section 1 of NASD rules, standing alone, is unconstitutionally vague. The second argument pertains to whether NASD was re-

quired by statute to submit its "interpretation" that the acceptance of such compensation was a violation of Article III, Section 1, to SEC prior to enforcing it. As is set forth herein, we find General Bond's second argument to be persuasive. We need not decide, therefore, whether the NASD rule standing alone is unconstitutionally vague.

a. *Vagueness.* General Bond first argues that the provisions of the rule requiring members to "observe high standards of commercial honor and just and equitable principles of trade" failed to provide fair warning to General Bond that its acceptance of compensation from issuers of securities would be considered a violation of the rule. *Citing Rose v. Locke*, 423 U.S. 48, 50, 96 S.Ct. 243, 244, 46 L.Ed.2d 185 (1975) (The Due Process Clause of the Fifth Amendment requires that sufficient warning be given so that individuals may conduct themselves so as to avoid that which is forbidden.) In its response, SEC does not challenge the applicability of the Due Process Clause to the disciplinary proceeding below, nor does it dispute the assertion that due process requires that NASD rules give fair warning of what conduct is prohibited before NASD members may be disciplined for engaging in such conduct. *See Handley Investment Co. v. S.E.C.*, 354 F.2d 64, 66 (10th Cir.1965). Moreover, SEC's brief does not assert that the provisions of Article III, Section 1 standing alone were sufficient to give adequate notice. The SEC maintains, however, that the requirements of due process were satisfied because General Bond had specific notice that its conduct violated NASD rules. In support of this assertion, SEC cites two documents: a 1973 publicly available "No–Action Letter" and a 1975 NASD "Notice to Members." These two documents are described below.

In *Monroe Securities, Inc.*, SEC No–Action Letter (Pub. Avail. June 4, 1973), SEC responded to a question from a broker as to whether he could charge an issuer a service charge for expenses incurred in entering quotations and making a market for the issuer's securities. The SEC's response included the following comments:

It is generally understood that broker-dealers have wide freedom to commence or

terminate making an over-the-counter market. The pricing of a stock or making of a market at any given time should involve a combination of factors, including the firm's current inventory position, its attitude toward the market, and any market being made in competition. In view of the common understanding of a market maker's role and economic motivations, an arrangement whereby a broker-dealer charges an issuer a fee for making a market in its stock may conflict with the anti-fraud provisions of the federal securities laws.

* * * Your attention is also directed to Section 17(b) of the Securities Act which makes it unlawful for any person for consideration to be received from an issuer to publish, give publicity to or circulate, any notice, circular, advertisement, or communication which, though not an offering for sale, describes such security without fully disclosing the compensation arrangement with the issuer.

*Id.* After discussing other aspects of the broker's proposal to charge fees, SEC concluded: "In our view your proposal raises serious questions under the federal securities laws; any attempt to implement such a plan would appear to be inadvisable."

On February 20, 1975, NASD issued Notice to Members 75–16, which echoed the matters set forth in the 1973 SEC No–Action Letter. The Notice stated in part:

Recently, questions have arisen with respect to the propriety of an issuer paying a member to make a market in its securities and whether it would be permissible under applicable securities laws for a member to charge an issuer for out of pocket expenses incurred in the course of making a market in an issuer's securities. An additional question concerns the acceptance by a member of unsolicited payments from an issuer in whose securities the member makes a market.

In connection with the above, the Association wishes to advise members that ramifications of these and several other related questions are currently being reviewed. As part of this review, the Association staff has recently met with the Securities and Exchange Commission staff to discuss, in general terms, the applicability of the federal securities laws to these practices and whether there were areas where some measure of liberalization could be achieved. For the reasons discussed below, both members and issuers are cautioned that it appears such payments may be prohibited under existing laws and are advised to consult with their counsel prior to taking any action in this regard.

By way of background to the above, it is important to note that members generally have considerable latitude and freedom to make or terminate market making activities in over-the-counter securities. The decision to make a market in a given security and the question of "price" are generally dependent on a number of factors including, among others, supply and demand, the firm's attitude toward the market, its current inventory position and exposure to risk and competition. The additional factor of payments by an issuer to a market maker would probably be viewed as a conflict of interest since it would undoubtedly influence, to some degree, a firm's decision to make a market and thereafter, perhaps, the prices it would quote. Hence, what might appear to be independent trading activity may well be illusory. In view of these and other factors, any arrangement whereby a member charges an issuer a fee for making a market or accepts an unsolicited payment from an issuer whose securities the member makes a market in raises serious questions under the anti-fraud provisions of the federal securities laws. In addition, the payment by an issuer to a market maker to facilitate market making activities may also violate Section 5 of the Securities Act of 1933.

Members should also be aware that in addition to the above mentioned concerns, Section 17(b) of the Securities Act of 1933 explicitly makes it unlawful for any person receiving consideration, directly or indirectly from an issuer, to publish or circulate any material which describes such issuer's securities without fully disclosing the receipt of such consideration, whether

past or prospective, and the amount thereof. In addition, such conduct may violate the provisions of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder.

The SEC contends that these documents provided sufficient notice that the conduct engaged in by General Bond was a violation of NASD rules. Additionally, the SEC points out that prior to five of the transactions in question, NASD staff members informed General Bond orally and in writing of NASD's view that acceptance of compensation of General Bond was prohibited by NASD rules.

b. *Invalid Rule Change.* General Bond's second argument is that the finding that its acceptance of compensation violated Article III, Section 1, constituted a "rule change" which was required by statute to be submitted by NASD to the SEC for approval prior to taking effect. General Bond relies upon 15 U.S.C. § 78s(b)(1), which provides:

> Each self-regulatory organization shall file with the Commission, in accordance with such rules as the Commission may prescribe, copies of any proposed rule or any proposed change in, addition to, or deletion from the rules of such self-regulatory organization (hereinafter in this subsection collectively referred to as a "proposed rule change") accompanied by a concise general statement of the basis and purpose of such proposed rule change. The Commission shall, upon the filing of any proposed rule change, publish notice thereof together with the terms of substance of the proposed rule change or a description of the subjects and issues involved. The Commission shall give interested persons an opportunity to submit written data, views, and arguments concerning such proposed rule change. No proposed rule change shall take effect unless approved by the Commission or otherwise permitted in accordance with the provisions of this subsection.

Article III, Section 1 of NASD rules was submitted to and approved by SEC. It is undisputed, however, that NASD did not file Notice to Members 75–16 with SEC prior to the disciplinary action against General Bond, nor did NASD file any other document with SEC indicating that a market maker's acceptance of compensation in exchange for listing a security in the pink sheets was conduct prohibited by Article III, Section 1.

The SEC contends that NASD was not required to submit Notice to Members 75–16 to the Commission for approval as a proposed rule or a rule change. The SEC points out that the Notice was issued on February 20, 1975. At that time, the Maloney Act required self-regulatory organizations to file "any changes in or additions to the rules of the association" with the Commission, but the statute did not provide any guidance on what constituted a "rule change." *See former* 15 U.S.C. § 78o–3(j) (1970). Subsequently, SEC notes, the Securities Acts Amendments of 1975 defined the "rules of an association" to include the constitution, articles of incorporation, bylaws, and rules of an association, together with *"such of the stated policies, practices, and interpretations of such … association … as the Commission, by rule, may determine to be necessary or appropriate in the public interest or for the protection of investors to be deemed to be rules of such … association…."* § 78c(a)(27) (emphasis added). After this amendment was added to the statute, SEC adopted Rule 19b–4 (17 C.F.R. § 240.19b–4), which provided that a stated policy, practice, or interpretation of a self-regulatory organization shall be deemed a rule change unless: 1) it is reasonably and fairly implied by an existing rule of the organization, or 2) it is concerned solely with administration of the organization and is not a stated policy, practice or interpretation

with respect to the meaning or enforcement of an existing rule of the organization. *See id.* The SEC concedes that NASD Notice to Members 75–16 (which SEC describes as a "statement of policy") would have to be submitted to the Commission for approval were it to·be proposed today. But, SEC contends "nothing in the statute, which requires approval of proposed rules or rule changes, requires the submission of rules that were in existence prior to the adoption of the amendments." Resp.Br. at 22.[2]

■ c. *Discussion.* After carefully considering the arguments of both parties, we must agree with General Bond that NASD's interpretation of Article III, Section 1 concerning acceptance of compensation was a "rule change" and was required by statute to be submitted to SEC for approval prior to enforcement of that interpretation. Because no such interpretation was filed with SEC prior to the disciplinary proceeding below, we conclude that the enforcement of the rule against General Bond was contrary to 15 U.S.C. § 78s(b)(1) and is therefore invalid. *See Id.* ("No proposed rule change shall take effect unless approved by the Commission. . . ."). We believe that such a view is the only result consistent with the statutory responsibility of SEC—both before and after the Securities Acts Amendments of 1975—to oversee the rule-making activities of a registered national securities association.

We do not quarrel with SEC's assertion that nothing in the 1975 Securities Acts Amendments required submission to SEC of NASD rules "that were in existence prior to adoption of the amendments." Nor can it be denied that the 1975 Amendments, unlike former § 78o–3(j), specifically indicated that NASD interpretations and policy statements could be considered rules changes. From these facts, SEC apparently concludes that under the Maloney Act, as it existed prior to

the Securities Acts Amendments of 1975, the issuance of an NASD interpretation or policy statement such as Notice to Members 75–16, although it established a new standard of conduct, was not considered a "rule change" and did not have to be submitted to SEC for approval. We disagree with this premise as applied in this case.

The Maloney Act of 1938 established extensive guidelines for the formation and oversight of "self-regulatory organizations" such as NASD. The Act supplemented SEC's regulation of·over-the-counter markets by providing a system of cooperative self-regulation through voluntary associations of brokers and dealers. In order to become registered as a national securities association under the Maloney Act, an association such as NASD was required to adopt extensive rules to ensure that the purposes of the Act were carried out. *See* former 15 U.S.C. § 78o–3 (1970). Those rules had to include a provision stating that the association's members would be disciplined for any violation of its rules and had to provide for a fair and orderly·procedure with respect to the disciplining of members. *Id.* § 78o–3(b)(10) & (11).

The Securities Exchange Commission was given extensive oversight responsibilities for such associations, including the responsibility of determining whether the association's rules as initially filed met the requirements of the Maloney Act. In order to become a registered association, the association had to file with SEC "[c]opies of its constitution, charter, or articles of incorporation or association, with all amendments thereto, and of its existing bylaws, and of any rules or instruments corresponding to the foregoing, whatever the name, hereinafter in this chapter collectively referred to as the 'rules of the association.'" *Id.* § 78o–3(a)(2). Pursuant to former § 78o–3(j), any subsequent changes in or additions to the rules of the

---

2. Additionally, the SEC asserts that, following the 1975 Amendments, the Commission initially adopted a provision in Rule 19b–4 that would have required self-regulatory organizations to file with the Commission rules in effect prior to the 1975 Amendments. The SEC contends that the Commission subsequently concluded, however, that the provision would provide little assistance and would impose a great burden, and therefore

the Commission determined that it would not require compliance with the provision. According to the SEC, the provision was removed from the rule in 1980. In sum, the SEC contends, "the statute and the rules thereunder do not require pre–1975 Amendment rules to be submitted to the Commission for approval." Resp.Br. at 23.

association were required to be filed with the Commission to become effective:

> (j) Filing changes or additions to association rules and current information.

Every registered securities association shall file with the Commission in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, copies of any changes in or additions to the rules of the association, and such other information ... as the Commission may require.... Any change in or addition to the rules of a registered securities association shall take effect upon the thirtieth day after the filing of a copy thereof with the Commission, or upon such earlier date as the Commission may determine, unless the Commission shall enter an order disapproving such change or addition; and the Commission shall enter such an order unless such change or addition appears to the Commission to be consistent with the requirements of subsections (b) and (d) of this subsection.

The Maloney Act additionally authorized SEC to request changes in NASD rules and gave SEC authority to order such changes if such a request were not complied with. *See former* § 78o –3(k)(2). *See also United States v. National Association of Securities Dealers*, 422 U.S. 694, 733, 95 S.Ct. 2427, 2449, 45 L.Ed.2d 486 (1975).

If, as SEC contends, NASD Notice to Members 75–16 established that acceptance of issuer-paid compensation by a market maker was a violation of Article III, Section 1, we find that such a determination was a "change in or addition to the rules" of NASD. Although SEC apparently had no regulations defining "rule change" at the time Notice to Members 75–16 was issued, the establishment of a new standard of conduct such as this must be considered a "rule change" un-

der any common sense definition of that term. *Cf. United States v. National Association of Securities Dealers*, 422 U.S. 694, 733, 95 S.Ct. 2427, 2449, 45 L.Ed.2d 486 (1975) ("[W]e see no meaningful distinction between the [NASD's] rules and the manner in which it construes and implements them. Each is equally a subject of SEC oversight.") More specifically, we conclude that the establishment of such a new standard was within the definition of "rule change" contemplated by Congress when it enacted former § 78o –3(j). As such, the change had to be filed with SEC under the provisions of former § 78o – 3(j) prior to becoming a valid rule of the association.

▪ We note that SEC was faced with a somewhat similar issue *In the Matter of The Rules of the National Association of Securities Dealers, Inc.*, Securities Exchange Act Rel. No. 3623 (Nov. 25, 1944), 1944 SEC LEXIS 114. In that case, objections were filed with SEC concerning a policy issued by NASD Board of Governors. The policy concerned an interpretation of Article III, Section 1 relating to price spreads and commissions charged by NASD members. Members objecting to the Board's interpretation of the rule argued that it constituted a rule change that had to be submitted to SEC under § 78o –3(j). In its decision, SEC indicated that the resolution of this issue turned on whether the purported interpretation "'does no more than express what must be clearly implied in the rule itself,' or whether it has the effect of adding some duty or standard not otherwise contained in the rules." 1944 SEC LEXIS 114, *16. Because the interpretation of the rule in that case was simply an application of a standard of conduct already expressed in another NASD rule, the Commission found that the Board's interpretation of Article III, Section 1 did not establish a new standard. *Id.* at *18.[3] By contrast, in this case SEC has not cited any

---

**3.** It appears that in most prior cases questions concerning a lack of notice or the validity of a rule change have been avoided because the broker is typically charged with a violation of Article III, Section 1 in conjunction with a violation of another NASD Rule. *See e.g., Todd & Company v. SEC*, 557 F.2d 1008, 1011 (3rd Cir.1977). *See also Carl F. Campbell*, Securities Exchange Act

Release No. 12793 (Sept. 13, 1976), 10 SEC Docket 459 ("We need only observe that terms such as 'high standards of commercial honor' and 'just and equitable principles of trade' refer, among other things, to standards of business conduct codified in the rules of the securities industry's self-regulatory bodies.")

previously established NASD rule (aside from its reliance on Notice to Members 75–16) that prohibited acceptance of issuer-paid compensation by a market maker under circumstances similar to those presented. Nor can we conclude that this type of conduct was so inherently deceptive that a ban against it was "clearly implied" by a provision requiring members to observe "high standards of commercial honor and just and equitable principles of trade."[4] The NASD, of course, is to be commended for taking the view that any conduct with the potential for deception or that involves a conflict of interest should be prohibited under its rules. When a prohibition sets a new standard of conduct for its members, however, the NASD is required by statute to submit such a change to SEC prior to enforcing it. In sum, we find that the enforcement of Article III, Section 1 against General Bond in this case for its acceptance of compensation represented a change in NASD rules that was invalid under 15 U.S.C. § 78s(b)(1).

■ 2. *Article III, Section 1—General Bond's Deceit of NASD Staff.* The SEC also determined that General Bond violated Article III, Section 1 when it continued to accept issuer-paid compensation after informing NASD that it would cease this practice. The SEC found that Mr. Pandolfo "deceived the staff by claiming that he had ceased accepting such listing fees, while continuing business as usual." Pet.App. at 5. General Bond argues that under the circumstances it was not bound to cease accepting compensation because the NASD incorrectly determined that acceptance of payments was prohibited by NASD rules. This argument ignores the fact that Mr. Pandolfo's deception of NASD staff formed the basis of this portion of SEC's ruling. Although we have determined that NASD rules in effect at the time did not prohibit the acceptance of these payments, our ruling does not absolve General Bond of culpability for making misrepresentations to NASD.

Under Article IV, Section 5 of NASD Rules, General Bond had an obligation to provide the information sought by NASD. General Bond attempts to cast Mr. Pandolfo's conduct as the product of a good faith dispute concerning the scope of an NASD rule and intimates that Pandolfo may have decided to continue accepting payments on advice from counsel. It is clear to us from SEC's opinion, however, that the Commission determined that Mr. Pandolfo intentionally deceived NASD staff concerning his practice of accepting compensation. This determination is supported by substantial evidence in the record. Moreover, we find that any reasonable person would know that such intentional deception of NASD while it is engaged in an investigation violates the prohibition against conduct contrary to high standards of commercial honor and just and equitable principles of trade. Consequently, we do not disturb the Commission's ruling that General Bond's deception of NASD staff violated Article III, Section 1.

3. *Rule 15c2–11—Failure to Maintain Reasonably Current Financial Information.*

---

**4.** We do not question NASD's or SEC's view that the type of conduct engaged in by General Bond may reasonably be considered deceptive to market participants. We do find, however, that reasonable persons could disagree as to whether a standard requiring "high standards of commercial honor" necessarily prohibited this type of conduct. NASD itself suggested as much in Notice to Members 75–16, when it indicated to its members that it was discussing "the applicability of the federal securities laws to these practices *and whether there were areas where some measure of liberalization could be achieved.*" (emphasis added).

Our ruling should not be taken to mean that every disciplinary action taken by the NASD or SEC will be considered a "rule change" unless an interpretation has been previously submitted to the SEC showing that identical conduct has been held to violate an NASD rule. Under SEC regulations, application of a Rule of Fair Practice to the particular facts of a case would not be considered a rule change where it is reasonably and fairly implied by an existing rule.

Moreover, we recognize that the securities laws and SEC Rules appropriately contain broad prohibitions against manipulative, deceptive or fraudulent practices. *See e.g.,* Rule 10b–5 (17 C.F.R. § 240.10b–5). General Bond's activities, however, were not alleged to have violated any of these provisions or any of the regulations governing market making activities. Thus, we are not called upon to determine whether it is fairly implied in Article III, Section 1, that any conduct which violates the anti-fraud provisions of the securities laws is conduct inconsistent with "high standards of commercial honor and just and equitable principles of trade."

Rule 15c2–11 (17 C.F.R. § 240.15c2–11) requires a broker-dealer submitting a quotation to maintain in its files certain information concerning the issuer that is "reasonably current" in relation to the day the quotation is submitted. The SEC found that General Bond violated Rule 15c2–11 by failing to maintain in its records reasonably current information with respect to two issuers. In so ruling, SEC stated that "[t]he broker-dealer has the burden of production under the Rule because the broker-dealer is in a better position than NASD or other authority to know the condition of a company whose stock it intends to list, and to obtain the requisite up-to-date financial information about the issuer." Pet.App. at 9. The SEC concluded that General Bond failed to show that information in its files was reasonably current.

■ General Bond now contends that SEC's determination that it had the "burden of production" on this issue constituted informal rule making. As such, General Bond argues, the rule should not have been applied retroactively. We agree with SEC, however, that SEC's determination did not constitute rule making, but was an interpretation of the requirements implied in an existing rule. The SEC's opinion indicates that when information in the broker's file falls outside of the regulatory presumption of what is "reasonably current," the broker bears the burden of producing documentation showing that the information in its files is nevertheless reasonably current. Although Rule 15c2–11 says nothing explicit about the burden of production, we find that SEC's interpretation is fairly implied by the rule's express requirements, which place an affirmative duty on the broker to maintain reasonably current information. *See* 17 C.F.R. § 240.15c2–11 ("[I]t shall be unlawful for any broker or dealer to publish any quotation for a security or ... to submit any quotation for publication ... unless such broker or dealer has in its records the documents and information required by this paragraph....").

■ 4. *Article IV, Section 5—Failure to Produce Materials Requested by NASD.* The SEC determined that General Bond violated Article IV, Section 5 of NASD Rules of Fair Practice by failing to produce information requested by NASD in the course of its investigation. General Bond concedes that it never produced the information but argues that it was not obligated to because the documents requested were "neither material nor necessary for the charge."

General Bond's argument borders on the frivolous. As SEC succinctly stated: "NASD member firms may not ignore NASD inquiries; nor may they take it upon themselves to determine whether information requested is material to an NASD investigation of their conduct. Once the NASD requested the documentation, the firm was obligated to comply fully with the request." Pet.App. at 9. The SEC's finding of a violation of Article IV, Section 5 is fully supported by the evidence.

5. *Sanctions.* General Bond's final argument is that the sanctions affirmed by SEC were excessive and constituted an abuse of discretion. General Bond contends that, because Mr. Pandolfo is now deceased, the sanctions imposed "impact no one except Mr. Pandolfo's estate and the heirs thereunder." Pet.Br. at 41.

General Bond is the petitioner in this case, not Mr. Pandolfo or his heirs. Our review is limited to determining whether the Commission abused its discretion in connection with the sanctions imposed upon General Bond for its violations of NASD Rules. *See C.E. Carlson, Inc. v. SEC,* 859 F.2d 1429, 1438 (10th Cir.1988).

As is evidenced by the opinion of the National Business Conduct Committee, the sanctions affirmed by SEC consisted of censure and an assessment of costs of $1,114, expulsion of General Bond from membership, a fine of $25,750 "representing the ill-gotten gains attributable to the listing fees charged by [General Bond]," and a fine of $20,000 "representing the monetary sanction attributable to [General Bond's] failures to respond."

With the exception of the fine of $25,750, we affirm the sanctions imposed by SEC. Regardless of whether Mr. Pandolfo's practice of accepting compensation was prohibited by a valid NASD rule, his deception of

NASD staff investigating his conduct and his failure to comply with NASD requests for various documents represent an egregious departure from the ethical standards of conduct established by NASD. This conduct fully supports the sanctions of costs, censure and expulsion, and the fine of $20,000 for General Bond's failure to respond to NASD requests.

The fine of $25,750 imposed below, which was said to represent General Bond's "ill-gotten gains," was based at least in part on General Bond's acceptance of compensation for listings in the pink sheets. Inasmuch as we have determined that Article III, Section 1 did not prohibit such conduct at the time General Bond engaged in it, we find it necessary to vacate that portion of the fine imposed. No sanction should be imposed for that alleged violation. The record does not disclose, however, whether this $25,750 was also based in part on any of the other violations committed by General Bond or whether the imposition of such a fine is necessary to adequately remedy these other violations. Accordingly, we remand the case to SEC for a reconsideration of whether this portion of the fine is appropriate.

The order of the Commission is affirmed in part and vacated in part. The case is remanded to SEC for reconsideration of a portion of the sanctions imposed upon Petitioner.