56 F.3d 1531
 312 U.S.App.D.C. 461
 NOTICE: D.C. Circuit Local Rule 11(c) states that unpublished orders, judgments, and explanatory memoranda may not be cited as precedents, but counsel may refer to unpublished dispositions when the binding or preclusive effect of the disposition, rather than its quality as precedent, is relevant.
G.K. SCOTT & CO., INC., et al., Petitioners,
v.
SECURITIES AND EXCHANGE COMMISSION, Respondent.
 No. 94-1161.
 United States Court of Appeals, District of Columbia Circuit.
 June 7, 1995.
 
 Petition for Review of an Order of the Securities and Exchange Commission.
 SEC
 PETITION DENIED.
 Before: SILBERMAN, SENTELLE, and HENDERSON, Circuit Judges.
 JUDGMENT
 PER CURIAM.
 
 
 1
 This cause came to be heard on a petition for review of an order of the Securities and Exchange Commission, and was briefed and argued by counsel. While the issues presented occasion no need for a published opinion, they have been accorded full consideration by the Court. See D.C.Cir.R. 36(b). On consideration thereof, it is
 
 
 2
 ORDERED and ADJUDGED, by this Court, that the petition for review is hereby denied for the reasons set forth in the accompanying memorandum. It is
 
 
 3
 FURTHER ORDERED, by this Court, sua sponte, that the Clerk shall withhold issuance of the mandate herein until seven days after disposition of any timely petition for rehearing. See D.C.Cir.R. 41(a)(2). This instruction to the Clerk is without prejudice to the right of any party at any time to move for expedited issuance of the mandate for good cause shown.
 
 MEMORANDUM
 
 4
 Petitioners G.K. Scott & Co., a member firm of the National Association of Securities Dealers (NASD), George Kevorkian, the firm's owner and president, and John Kevorkian, the firm's trader, challenge the SEC's determination that petitioners charged retail customers unfair and fraudulent markups in the sale of certain securities in the over-the-counter market. The NASD interprets Article III, Section 4 of the NASD Rules of Fair Practice to require that, in general, a dealer's markup may not exceed 5% of the prevailing market price for a security. NASD Securities Dealers Manual (CCH) p 2154 at 2056-7 (1995) ("NASD Manual "); see In re Thill Securities Corp., 42 S.E.C. 89, 92 n. 4 (1964); In re NASD, 17 S.E.C. 459 (1944). In this case, the SEC approved the NASD's finding that, over an 11-day period in September 1988, G.K. Scott traded 100% of the volume in First Agate Corporation units and warrants and 96.25% of the volume in First Agate common stock, and charged markups on these securities ranging from 16% to 480.95% over the prevailing market price for a total of $666,079.86 in excessive markups.
 
 
 5
 We find no merit in petitioners' several challenges to the SEC decision. First, we reject the assertion that the SEC erred in relying on G.K. Scott's contemporaneous retail cost in determining the prevailing market price for First Agate securities, rather than on contemporaneous price quotations obtained from three other dealers. Where, as here, an integrated dealer acting as a market maker so "dominates and controls" the market for a security that "the firm, and not a competitive market, set the prices for [the] securit[y]," SEC Decision at 6 [J.A. 489], the SEC has made clear that prevailing market price must ordinarily be based on the dealer's contemporaneous cost--the price at which the dealer acquired the security in a contemporaneous transaction with another dealer. See Orkin v. SEC, 31 F.3d 1056, 1064 (11th Cir.1994); In re Meyer Blinder, 50 S.E.C. 1215, 1221 (1992); In re Alstead, Dempsey & Co., 47 S.E.C. 1034, 1036-38 (1984). G.K. Scott made only one contemporaneous wholesale purchase during the 11-day trading period in question--on September 30, 1988, the last day of the period. The NASD relied on this transaction in determining the prevailing market price for transactions that day. For the remaining 10 days, the NASD relied on G.K. Scott's contemporaneous retail purchases from its own customers to determine "prevailing market price," after adding 5% to those prices to reflect the imputed markdown that a firm charges its customers (but not other dealers).
 
 
 6
 The SEC's policy of relying on contemporaneous cost to determine prevailing market price in transactions where the market is dominated and controlled by a single dealer was not a "previously unannounced" standard, as petitioners claim. [GKSC Br. at 22-27.] Rather, it was clearly set forth in Alstead, supra, and in In re Rooney, Pace Inc., 48 S.E.C. 891, 899 (1987), and was applied in In re Costello, Russotto & Co., 42 S.E.C. 798, 800-01 (1965) (citing cases). Cf. Barnett v. United States, 319 F.2d 340 (8th Cir.1963) (Commission entitled to consider dealer's contemporaneous retail cost as evidence of prevailing market price); In re Universal Heritage Investments Corp., 47 S.E.C. 839, 843 (1982). And, while we can find no case prior to September 1988 in which the SEC or NASD specifically relied on a dominant market maker's contemporaneous retail cost in determining prevailing market price, we think the SEC did not abuse its discretion here or deny petitioners adequate notice in using contemporaneous retail costs as a benchmark where contemporaneous wholesale cost information was not available. The SEC may reasonably conclude that in a market dominated by a single integrated dealer, that dealer's contemporaneous retail cost more accurately reflects prevailing market price than does the price it would charge its customers. We note that the SEC has specifically affirmed this practice in several recent cases. See Meyer Blinder, 50 S.E.C. at 1219; In re LSCO Securities, Inc., 50 S.E.C. 518, 519-20 (1991). For these reasons, we reject petitioners' claim that the lack of adequate notice of the NASD's pricing policy deprived them of due process.
 
 
 7
 Because we determine that petitioners had adequate notice of the applicable "contemporaneous cost" method for calculating the prevailing market price for the subject securities, we necessarily reject their claim that they were entitled to rely instead on inter-dealer quotations to determine prevailing market price. Petitioners ground this assertion in their reading of the NASD Board of Governors' Interpretation of Article III, Section 1 of the NASD Rules (the "best execution" interpretation), Part A of which provides that in carrying out "any transaction for or with a customer," members "shall use reasonable diligence to ascertain the best inter-dealer market for the subject security." NASD Manual (CCH) p 2151.03 at 2025 (1995). This interpretation was amended in 1988 to add the requirement that in executing customer orders with respect to a non-NASDAQ security, members shall "obtain quotations from three dealers ... to determine the best inter-dealer market for the subject security." Id. at 2026.
 
 
 8
 Contrary to petitioners' claim, however, compliance with the terms of the "best execution" interpretation does not allow a dealer to circumvent the requirement that it base its calculation of "prevailing market price" on contemporaneous cost. The courts and the SEC have long held that inter-dealer quotations are an unreliable means of determining the prevailing market price where the market is dominated by a single firm. Alstead, 47 S.E.C. at 1036; see In re Century Capital Corp., 50 S.E.C. 1280, 1281-82 (1992), aff'd mem., 22 F.3d 1184 (D.C.Cir.1994); Orkin, 31 F.3d at 1064; In re Powell & Associates, Inc., 47 S.E.C. 746, 747 (1982); In re Gateway Stock & Bond, Inc., 43 S.E.C. 191, 193 (1966); In re Naftalin & Co., 41 S.E.C. 823, 828 (1964). Further, the "best execution" interpretation of Article III, Section 1 itself makes clear that its requirements "do not relate to the reasonableness of commission rates, markups or markdowns which are governed by Article III, Section 4 of the NASD Rules of Fair Practice." NASD Manual (CCH) p 2151.03 at 2026 (1995). And, at the time the 1988 amendments to the "best execution" interpretation were proposed, the NASD notified its members that its markup policy had not changed, and that "compliance with the new amendments will not necessarily assure compliance with the NASD markup policy." NASD Notice to Members No. 88-83 (November 1988) [GKSC Reply Br. Tab A].
 
 
 9
 Nor are we persuaded by petitioners' assertion that the NASD's 5% markup policy is invalid because it was never filed with and approved by the SEC after notice and comment under Section 19(b)(1) of the Exchange Act, 15 U.S.C. Sec. 78s(b)(1) (1988). As adopted in 1975, Sec. 78s(b)(1) requires that NASD follow this procedure with respect to "any proposed rule or any proposed change in, addition to, or deletion from the rules." Although, as the SEC concedes, the markup policy satisfies the definition of "rule" under the amendments to the Act and Commission regulations, see 15 U.S.C. Sec. 7c(a)(27) (defining "rule" to include "stated policies, practices, and interpretations"), and 17 C.F.R. 240.19b-4 (same), we agree with the Commission that the language of Sec. 78s(b)(1) does not require submission of a policy which was already in effect at the time of the 1975 amendments to the Exchange Act. See Meyer Blinder, 50 S.E.C. at 1227 n. 51 (explaining that the SEC initially adopted but then withdrew a provision to its rules requiring the filing of pre-1975 policies with the SEC for notice and comment).
 
 
 10
 Our decision on this point is not in conflict with General Bond & Share Co. v. SEC, 39 F.3d 1451 (10th Cir.1994), upon which petitioners rely. There, the court determined that a different NASD policy--one prohibiting acceptance of issuer-paid compensation by a market maker--was a "rule change" which should have been filed with the SEC and subjected to notice and comment under both the pre- and post-1975 versions of the Exchange Act. Id. at 1458-60. The Tenth Circuit explicitly distinguished the NASD's markup policy from the rule at issue in General Bond, citing the SEC's 1944 determination in In re NASD that the 5% markup policy did not constitute a "rule change," but was simply "an application of a standard of conduct already expressed in another NASD rule"--specifically, Article III, Section 4 (NASD's "fair price" rule). Id. at 1459, citing In re NASD, 17 S.E.C. 459 (1944).
 
 
 11
 Similarly, we reject the assertion that NASD's "contemporaneous cost" standard for determining prevailing price in markets dominated and controlled by a single market maker should have been subjected to Sec. 78s(b)(1) review. We do not think that the Commission abused its discretion in determining that this policy was not a "proposed rule change" under 17 C.F.R. Sec. 240.19b-4, and thus was not subject to filing, notice, and comment requirements, because it was "reasonably and fairly implied" by NASD's longstanding interpretation of Article III, Section 4. See 17 C.F.R. Sec. 240.19b-4(c)(1) (stated policies, practices and interpretations are not "proposed rule changes" where fairly implied by existing rules).
 
 
 12
 Finally, we conclude that the SEC did not abuse its discretion in determining that the firm and John Kevorkian acted with extreme recklessness amounting to scienter under the standards articulated in SEC v. Steadman, 967 F.2d 636, 641 (D.C.Cir.1992), in setting prices resulting in charges of fraudulent markups to customers. In particular, we reject petitioners' assertion that George Kevorkian's inconclusive efforts to ascertain the correct pricing standards for First Agate securities may be deemed to demonstrate that John Kevorkian did not act recklessly.
 
 
 13
 After careful consideration we have determined that petitioners' remaining arguments are unpersuasive and do not warrant discussion.