**SAMUEL B. FRANKLIN & COMPANY,**
Petitioner,

v.

**SECURITIES AND EXCHANGE COMMISSION, Respondent.**

No. 16514.

United States Court of Appeals
Ninth Circuit.

May 1, 1961.

Rehearing Denied June 3, 1961.

11. See footnote 7.

**720**

Samuel B. Franklin, in pro. per.

Walter P. North, Gen. Counsel, David Ferber, Asst. Gen. Counsel, and John A. Dudley, Atty., S.E.C., Washington, D. C., for respondent.

Before CHAMBERS, Chief Judge, and BARNES, HAMLEY, HAMLIN, JERT-BERG, MERRILL and KOELSCH, Circuit Judges.

HAMLIN, Circuit Judge.

Samuel B. Franklin & Co., herein called the petitioner, seeks review of an order of the Securities and Exchange Commission. That order affirmed disciplinary action taken by the National Association of Securities Dealers, Inc., imposing upon Franklin a censure, a fine of $1,000 and costs of $773.80.

Section 15A of the Securities and Exchange Act of 1934, 15 U.S.C.A. § 78o–3, was added by the so-called Maloney Act in 1938. This amendment provides for registration with the SEC of one or more "national securities association." Those portions of the statute applicable to this case are set out in the margin.[1] The

---

1. Sec. 15A. "(a) Any association of brokers or dealers may be registered with the Commission as a national securities association pursuant to subsection (b), or as an affiliated securities association pursuant to subsection (d), under the terms and conditions hereinafter provided in this section, by filing with the Commission a registration statement in such form as the Commission may prescribe, * * *:

\* \* \* \* \*

"(b) An applicant association shall not be registered as a national securities association unless it appears to the Commission that—

\* \* \* \* \*

"(7) the rules of the association are designed to prevent fraudulent and manipulate acts and practices, to promote just and equitable principles of trade, to provide safeguards against unreasonable profits or unreasonable rates of commissions or other charges, and, in general, to protect investors and the public interest, and to remove impediments to and perfect the mechanism of a free and open market; and are not designed to permit unfair discrimination between customers or issuers, or brokers or dealers, to fix minimum profits, to any schedule or fix minimum rates of commissions, allowances, discounts, or other charges;

National Association of Securities Dealers, Inc., herein referred to as NASD, has been registered under the provisions of this act.

On December 11, 1956, a complaint against petitioner was filed by the District Business Conduct Committee No. 2 of the NASD. In this complaint the petitioner was charged with "selling securities to customers at prices which were not fair in view of all the relevant circumstances" in violation of Sections 1 and 4 of Article III of the Rules of Fair Practice of the NASD.[2] The District Business Conduct Committee found that

petitioner had violated the rules of fair practice, censured him, imposed a fine of $1,000 and assessed costs of the proceedings in the amount of $773.80. Thereafter, a hearing was held before a subcommittee of the Board of Governors of the NASD. On May 19, 1958, a decision was rendered upholding the action of the District Business Conduct Committee and finding in part as follows:

"Therefore, it is the conclusion of the Board of Governors:

"(1) That the Member did violate the Rules as alleged and found by

"(8) the rules of the association provide that its members shall be appropriately disciplined, by expulsion, suspension, fine, censure, or any other fitting penalty, for any violation of its rules;

"(9) the rules of the association provide a fair and orderly procedure with respect to the disciplining of members and the denial of membership to any broker or dealer seeking membership therein. In any proceeding to determine whether any member shall be disciplined, such rules shall require that specific charges be brought; that such member shall be notified of, and be given an opportunity to defend against, such charges; that a record shall be kept; and that the determination shall include (A) a statement setting forth any act or practice in which such member may be found to have engaged, or which such member may be found to have omitted, (B) a statement setting forth the specific rule or rules of the association of which any such act or practice, or omission to act, is deemed to be in violation, (C) a statement whether the acts or practices prohibited by such rule or rules, or the omission of any act required thereby, are deemed to constitute conduct inconsistent with just and equitable principles of trade, and (D) a statement setting forth the penalty imposed. * * *

* * * * *

"(g) If any registered securities association (whether national or affiliated) shall take any disciplinary action against any member thereof, or shall deny admission to any broker or dealer seeking membership therein, such action shall be subject to review by the Commission, * * *.

"(h) (1) In a proceeding to review disciplinary action taken by a registered se-

curities association against a member thereof, if the Commission, * * * shall (A) find that such member has engaged in such acts or practices, or has omitted such act, as the association has found him to have engaged in or omitted, and (B) shall determine that such acts or practices, or omission to act, are in violation of such rules of the association as have been designated in the determination of the association, the Commission shall by order dismiss the proceeding, unless it appears to the Commission that such action should be modified * *."

2. Section 1. A member, in the conduct of his business, shall observe high standards of commercial honor and just and equitable principles of trade.

* * * * *

Section 4. In "over-the-counter" transactions, whether in "listed" or "unlisted" securities, if a member buys for his own account from his customer, or sells for his own account to his customer, he shall buy or sell at a price which is fair, taking into consideration all relevant circumstances, including market conditions with respect to such security at the time of the transaction, the expense involved, and the fact that he is entitled to a profit; and if he acts as agent for his customer in any such transaction, he shall not charge his customer more than a fair commission or service charge, taking into consideration all relevant circumstances including market conditions with respect to such security at the time of the transaction, the expense of executing the order and the value of any service he may have rendered by reason of his experience in and knowledge of such security and the market therefor.

the District Business Conduct Committee; and

"(2) That such acts were contrary to high standards of commercial honor and just and equitable principles of trade.

"Therefore, the Board affirms the Decision of the District Business Conduct Committee and assesses the costs of this proceeding in the amount of $153.29."

Petitioner then appealed to the Securities and Exchange Commission seeking to set aside the decision of the Board of Governors under Section 15A(h) of the Act. On March 24, 1959, the SEC filed "Findings and Opinion of the Commission" in which it discussed in detail the conduct of the petitioner and his contentions and then stated:

"We accordingly conclude that, as found by the NASD, applicant sold and purchased securities at prices which were not fair under all the relevant circumstances and not reasonably related to current market prices, and that such conduct was inconsistent with just and equitable principles of trade and violated Sections 1 and 4 of Article III of the NASD rules."

An order was then made dismissing petitioner's application for review. Petitioner's application for a rehearing was denied on April 20, 1959, and on June 18, 1959, he asked this court to review the action of the SEC.

The first question to which we will address our attention is whether the petition for review was timely filed in this court. It was filed more than 60 days after the SEC order of March 24, 1959, but within 60 days from the denial by the SEC on April 20, 1959, of the petition for rehearing. Section 25(a) of the Securities and Exchange Act of 1934, 15 U.S.C.A. § 78y(a), provides in part as follows:

"Any person aggrieved by an order issued by the Commission * *

may obtain a review of such order in the Court of Appeals of the United States * * * by filing in such court within sixty days after the entry of such order, a written petition praying that the order of the Commission be modified or set aside in whole or in part."

Section 10(c) of the Administrative Procedure Act, 5 U.S.C.A. § 1009(c), provides in part as follows:

"(c) Every agency action made reviewable by statute and every final agency action for which there is no other adequate remedy in any court shall be subject to judicial review. Any preliminary, procedural, or intermediate agency action or ruling not directly reviewable shall be subject to review upon the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final shall be final for the purposes of this subsection whether or not there has been presented or determined any application * * * for any form of reconsideration, * * *."

In Consolidated Flower Shipments, Inc., Bay Area v. C. A. B., 9 Cir., 1953, 205 F.2d 449, 451, this court had occasion to consider the provisions of 5 U.S.C.A. § 1009(c) in connection with the review of an order of the CAB.[3] The court there determined that the language of 5 U.S.C.A. § 1009(c) was plain and required a holding that petitioning the agency for reconsideration did not extend the time to appeal from the original order of the agency. In so holding, the court stated that there was "no ambiguity in this Act to be clarified by resort to legislative history." In so reasoning the court relied upon three decisions of the Supreme Court: Packard Motor Car Co. v. N.L.R.B., 1947, 330 U.S. 485, 67 S.Ct. 789, 91 L.Ed. 1040; Ex parte Collett, 1949, 337 U.S. 55, 69 S.Ct. 944, 959, 93 L.Ed. 1207; George Van Camp & Sons Co. v. American Can Co., 1929, 278

---

**3.** In Northwest Marine Terminals Ass'n v. Federal Maritime Board, 9 Cir., 1955, 218 F.2d 815, this court in a *per curiam* opinion followed Consolidated Flowers.

U.S. 245, 49 S.Ct. 112, 73 L.Ed. 31.[4] The respondent has asked us to reconsider that holding.

In Association of Westinghouse Salaried Employees v. Westinghouse Electric Corp., 1954, 348 U.S. 437, 75 S.Ct. 489, 491, 99 L.Ed. 510, and subsequent to the decision in Consolidated Flowers, the Supreme Court was faced with the problem of construing certain sections of the Taft-Hartley Act. Justice Frankfurter indicated that the section involved could be read to have a clear meaning but stated that the section must be placed "in the context of the legislation as a whole." He then went on to say:

> "And considering that the construction that we have found seems plain, the so-called 'plain meaning rule,' on which construction is from time to time rested also in this Court, likewise makes further inquiry needless and indeed improper. *But that rule has not dominated our decisions. The contrary doctrine has prevailed.* See Boston Sand & Gravel Co. v. United States, 278 U.S. 41, 48, 49 S.Ct. 52, 73 L. Ed. 170; United States v. Dickerson, 310 U.S. 554, 561, 60 S.Ct. 1034, 84 L.Ed. 1356. And so we proceed to an examination of the legislative history to see whether that raises such doubts that the search for meaning should not be limited to the statute itself." (Emphasis added.)[5]

5 U.S.C.A. § 1009(c) provides for judicial review of "final agency action." That portion of the Administrative Procedure Act which defines "agency action" [6] suggests that the purpose of the Act was to increase, or at least not to decrease, the scope of administrative procedures as they had been developed prior to the adoption of the APA. Prior to the adoption of the Act the general rule was that a petition for review by a court was timely if filed within 60 days of the denial of a petition for review.[7] We feel that although an agency's order is "final" in that it is a proper basis for court review without more, if it is followed by a timely application for rehearing the later order denying the rehearing becomes "final agency action." A reading of the legislative history of the Act also supports this position.[8]

---

4. Each of these three cases stated that where the language of a statute is plain and unambiguous, there is no occasion to examine the legislative history.

5. 348 U.S. at page 444, 75 S.Ct. at page 492.

6. "Agency action" includes the whole or part of *every agency* rule, *order*, license, *sanction, relief,* or the equivalent *or denial thereof,* or failure to act. 5 U.S. C.A. § 1001(g).

   "Order" means the *whole or any part* of the final disposition (whether affirmative, *negative,* injunctive, or declaratory in form) of any agency *in any matter other than rule making* but including licensing. 5 U.S.C.A. § 1001(d).

   "Sanction" includes the *whole or part of any agency* (1) prohibition, requirement, limitation, or other condition affecting the freedom of any person; (2) *withholding of relief;* (3) imposition of any form of penalty or fine; (4) destruction, taking, seizure, or withholding of property; (5) assessment of damages, reimbursement, restitution, compensation, costs, charges, or fees; (6) requirement, revocation, or suspension of a license; or (7) taking of other compulsory or restrictive action. "Relief" includes the *whole or part of any agency* (1) grant of money, assistance, license, authority, exemption, exception, privilege, or remedy; (2) recognition of any claim, right, immunity, privilege, exemption, or exception; or (3) *taking of any other action upon the application or petition of,* and beneficial to, *any person.* 5 U.S.C.A. § 1001(f). [Emphasis added.]

7. See, Braniff Airways, Inc. v. C. A. B., 1945, 79 U.S.App.D.C. 341, 147 F.2d 152.

8. "The term 'agency action' brings together previously defined terms in order to simplify the language of the judicial-review provisions of (5 U.S.C.A. § 1009(c)) and to *assure the complete coverage of every form of agency power,* proceeding, action, *or inaction.*" [Emphasis added.] H.R.Rep. No. 1980, 79th Cong., 2d Sess. (1946); Administrative Procedure Act, Legislative History, 79th Cong. (U.S. Government Printing Office 1946) at 255.

At the time the APA was being considered by Congress, Attorney General Tom C. Clark submitted a letter of comment and an appendix containing a detailed analysis of the statute. As a part of the comment, the Attorney General said, "It also *restates the law* covering judicial review of administrative action." [Emphasis added.] That portion of the appendix specifically referring to 5 U.S. C.A. § 1009(c) says:

"It is intended to state existing law. The last sentence makes it clear that the doctrine of exhaustion of administrative remedies with respect to finality of agency action is intended to be applicable only (1) where expressly required by statute (as, for example, is provided in 49 U.S.C.[A. §] 17(9)) or (2) where the agency's rules require that decisions by subordinate officers must be appealed to superior agency authority before the decision may be regarded as final for the purposes of judicial review." [9]

Congressman Francis W. Walter, chairman of the Administrative Procedure Act subcommittee, in commenting upon 5 U.S.C.A. § 1009(c), said:

"An act is final, whether or not there has been presented or determined an application for any form of reconsideration, unless statutes otherwise expressly require.

"The provisions of this section are technical but involve no departure from the usual and well understood rules of procedure in this field." [Emphasis added.] [10]

In October, 1960, the Court of Appeals for the District of Columbia Circuit, in Outland v. C. A. B., D.C.Cir., 1960, 284 F. 2d 224, 226, had occasion to consider the question "[w]hether the petition for review failed in that it was filed within 60 days after the Board's decision on the motion for reconsideration but more than 60 days after the Board's initial decision." The court there said:

"The legislative history of 5 U.S. C.A. 1009(c) indicates that it was adopted to achieve harmony with the holding in Levers v. Anderson, 1945, 326 U.S. 219, 66 S.Ct. 72, 90 L.Ed. 26, to the effect that a motion for rehearing was not necessary to exhaust administrative remedies. However, while making judicial review available without a motion for a rehearing, that statute did not operate to repeal the law with respect to finality. Where a motion for rehearing is in fact filed, there is no final action until the rehearing is denied, as we said in Braniff Airways, Inc. v. Civil Aeronautics Board, supra [147 F.2d 152]. Section 1009(c) does not command a motion for rehearing in order to reach finality by exhaustion of administrative remedies; it leaves that to each litigant's choice. But when the party elects to seek a rehearing there is always a possibility that the order complained of will be modified in a way which renders judicial review unnecessary. Practical considerations, therefore, dictate that when a petition for rehearing is filed, review may properly be deferred until this has been acted upon." [11]

A holding that a petition for a rehearing before an agency tolls the running of the period for filing a petition for a review will permit an agency to have an opportunity to reconsider its decision and possibly to correct any errors or misunderstandings concerning it. Counsel will not have to file a protective appeal in the event that the agency has not passed upon

**9.** S.Rep. No. 752, 79th Cong., 1st Sess. (1945); Administrative Procedure Act, Legislative History, 79th Cong. (U.S. Government Printing Office 1946) at 230.

**10.** Proceedings in the House of Repre-

sentatives, May 24, 1946; Administrative Procedure Act, Legislative History, 79th Cong. (U.S. Government Printing Office 1946) at 369.

**11.** 284 F.2d at page 227.

the petition for rehearing within sixty days.[12]

■■ Having by reason of the suggestion of Justice Frankfurter examined the legislative history of the APA, together with the general provisions of that Act, we now have the view that our decisions in Consolidated Flowers and Northwest Marine Terminal should not be followed. The legislative history of 5 U.S.C.A. § 1009(c) convinces us that that section was intended to mean only that it was not necessary to file a petition for rehearing in order to be eligible to obtain judicial review. We now hold that the timely filing of a petition for agency reconsideration does toll the sixty-day period for appeal to this court and that an appeal taken within sixty days from the termination of the petition for reconsideration by the agency is timely.

■ We now reach a consideration of the case upon its merits.

The charge against petitioner was that in his transactions his markup or markdown from the current market prices of securities was excessive. The basic facts do not appear to be in dispute. The prices fixed by petitioner in over seven hundred sales transactions and in over four hundred purchase transactions were examined. The record shows that in 260 of the 731 sales transactions petitioner's markup exceeded 20 per cent,—in 99 instances being between 30 per cent and 62 per cent. In 20 purchases by petitioner, the markdown ranged from 20 per cent to 37 per cent; and in 143 purchases the markdown ranged from 5 per cent to 20 per cent.[13] Petitioner does not question

these figures, but contends that the "National Association of Security Dealers, Inc. 5% Rule is unfair when it applies to low-priced and penny stocks."

It appears that some time ago the NASD conducted a survey of the prices charged by its members, and the Board of Governors of the Association reported that 47 per cent of the transactions "were effected at a gross spread or markup over the current market of not over 3 percent, and 71 percent at not over 5 percent." The Board of Governors then communicated to the membership the result of this survey, stating in part: "In the case of certain low-priced securities, such as those selling below $10.00, a somewhat higher percentage may sometimes be justified. On the other hand, 5 percent or even a lower rate is by no means always justified."

It can be seen from the language of the above statement that there is no hard and fast "5 percent rule" as complained of by petitioner. The Commission did not discipline him merely because his commissions were in excess of 5 per cent. It did find that his "mark-ups and mark-downs, at least in those transactions in which they were greater than 20% clearly were excessive" and that Franklin "sold and purchased securities at prices which were not fair under all the relevant circumstances and not reasonably related to market prices, and that such conduct was inconsistent with just and equitable principles of trade and violated Sections 1 and 4 of Article III of the NASD rules." The evidence amply supports the findings of the Commission.[14] The dis-

12. In Outland, 284 F.2d at page 228, the court said, "[t]he contrary result reached by the Ninth Circuit has caused parties to file so called 'protective' petitions for judicial review while petitions for rehearing before the Board were pending. A whole train of unnecessary consequences flowed from this: the Board and other parties may be called upon to respond and oppose the motion for review; when the Board acts, the petition for judicial review must be amended to bring the petition up to date."

13. Of the 731 sales, 108 involved sums in excess of $500; 498 involved sums of $100 to $500; the remaining 125 involved sums of less than $100. In the 260 instances where the markup exceeded 20 per cent, 184 transactions involved $100 or more; in the 99 instances where the markup exceeded 30 per cent, 55 transactions involved $100 or more.

14. The SEC recently confirmed its aproval of the policy of the NASD as to commissions in low priced stock transactions in In the Matter of the Applica-

cipline administered was within that permitted by the rules of the NASD and was not excessive.

The order of the SEC is affirmed.

tion of Midland Securities, Inc. (Nov. 16, 1960) when it stated:

"We also reject applicants' contention that since the securities involved were low in price, their mark-ups were justified under the NASD's statement of policy indicating that a 'somewhat higher' mark-up than 5% may be appropriate for stock selling for less than $10 per share."