**Daniel R. LEHL, Petitioner,**

v.

**SECURITIES AND EXCHANGE COMMISSION, Respondent.**

**No. 94–9551.**

United States Court of Appeals, Tenth Circuit.

July 19, 1996.

David A. Zisser, Berliner, Zisser, Walter & Gallegos, P.C., Denver, Colorado, for Petitioner.

Susan S. McDonald, Senior Litigation Counsel (Simon M. Lorne, General Counsel, Eric Summergrad, Principal Assistant General Counsel, and Susan K. Straus, Attorney, with her on the brief), Securities and Exchange Commission, Washington, D.C., for Respondent.

Before ANDERSON, McWILLIAMS, and ENGEL,* Circuit Judges.

ANDERSON, Circuit Judge.

Daniel R. Lehl petitions for review of a final order by the Securities and Exchange Commission ("SEC") sustaining disciplinary action taken against him by a registered securities association, the National Association of Securities Dealers, Inc. ("NASD"). Based on our review of the record, we affirm the SEC's order.

In 1990, Lehl was a securities salesman associated with First Choice Securities in Denver. First Choice was a registered member of the NASD and Lehl was a registered representative. Between July 17 and August 3, 1990, Lehl sold 285,000 shares of stock in Champions Sports, Inc., to retail customers in eleven separate transactions. Lehl charged his customers 6.5¢ per share, the "execution price" established by his firm.[1] The Denver branch of First Choice obtained the stock from the firm at a "strike price" of 5¢ per share. Each of these prices was posted daily on a board in the front of the Denver office. The difference between the strike price and the execution price constituted the firm's "gross commission" on each transaction, from which Lehl's individual commissions were paid. Lehl knew these facts. He did not know, however, and never inquired into, the price per share the firm had paid for its Champions stock, which was in fact 3.125¢ in nine of the transactions and 3.5¢ in the other two.

In 1991, the NASD commenced disciplinary proceedings against First Choice and various individuals associated with the firm, including Lehl, for their actions in marketing Champions stock. The NASD District Business Conduct Committee found Lehl had violated the NASD Rules of Fair Practice by charging unfair and excessive prices without proper disclosure to his customers. The Committee censured Lehl and ordered him to requalify by examination as a registered representative. On appeal, the NASD National Business Conduct Committee affirmed and added a $5000 fine, plus costs. On de novo review, the SEC affirmed in pertinent part and sustained the NASD's sanctions. Lehl seeks review of the SEC's adverse decision.

Our jurisdiction to review final SEC orders comes from Section 25(a)(1) of the Securities Exchange Act of 1934, 15 U.S.C. § 78y(a)(1). The SEC's factual findings are conclusive if supported by substantial evidence.[2] *Id.* § 78y(a)(4); *see General*

---

* The Honorable Albert J. Engel, Circuit Judge of the Sixth Circuit Court of Appeals, sitting by designation.

1. Lehl and the NASD submitted conflicting evidence on whether Lehl had discretion to sell below the execution price. The SEC assumed for purposes of its opinion that he had no such discretion, *see* R. Vol. 3 at 2259, and we do likewise.

2. "Substantial evidence" in this context refers to a minimum quantity of relevant evidence objec-

tively adequate to support the findings when viewed in light of the record as a whole. *See Steadman v. SEC,* 450 U.S. 91, 98, 100, 101 S.Ct. 999, 1007, 67 L.Ed.2d 69 (1981); *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 488, 71 S.Ct. 456, 459, 464–65, 95 L.Ed. 456 (1951); *Wall Street West, Inc. v. SEC,* 718 F.2d 973, 974 (10th Cir.1983); *Buchman v. SEC,* 553 F.2d 816, 820 (2d Cir.1977); *Archer v. SEC,* 133 F.2d 795, 799 (8th Cir.), *cert. denied,* 319 U.S. 767, 63 S.Ct. 1330, 87 L.Ed. 1717 (1943).

*Bond & Share Co. v. SEC,* 39 F.3d 1451, 1453 (10th Cir.1994). We review de novo the SEC's legal conclusions in this case. *See Kapcia v. INS,* 944 F.2d 702, 705 (10th Cir. 1991); *Orkin v. SEC,* 31 F.3d 1056, 1063 (11th Cir.1994).

The SEC found Lehl violated Sections 1 and 4 of the NASD Rules of Fair Practice, Article III. Section 1 reads: "A member, in the conduct of his business, shall observe high standards of commercial honor and just and equitable principles of trade." Section 4 reads:

> In "over-the-counter" transactions, whether in "listed" or "unlisted" securities, if a member ... sells for his own account to his customer, he shall ... sell at a price which is fair, taking into consideration all relevant circumstances, including market conditions with respect to such security at the time of the transaction, the expense involved, and the fact that he is entitled to a profit....

*See also* NASD Rules of Fair Practice, art. I, § 5 ("Persons associated with a member shall have the same duties and obligations as a member under these Rules of Fair Practice."), *reprinted in* Resp't Br., Statutory Addendum at 2A.

In his petition, Lehl advances five reasons why he should not be held accountable for selling Champions stock at unfair markups: (1) the SEC's findings of misconduct varied from the misconduct charged against him; (2) the NASD never properly adopted its markup policy; (3) SEC enforcement of the NASD markup policy is an improper regulation of securities prices; (4) the SEC improperly calculated the markups; and (5) the record contains insufficient evidence to support the SEC's finding that Lehl was personally culpable. We will address each of these contentions in turn.

■ *1. The SEC's Findings.* First, Lehl argues the SEC found him liable for *charging* excessive and unfair prices when the complaint against him alleged he *failed to disclose* the prices were excessive and unfair. The complaint in fact alleged in pertinent part as follows:

### SECOND CAUSE OF COMPLAINT

#### Failure to Disclose Unfair Prices

24. At various times during the period from May 10, 1990 through August 3, 1990, respondent[ ] ... Lehl ... either solicited customers to purchase securities of Champion[s] Sports, Inc., or otherwise caused customer orders to be received and processed for purchases of these securities, at prices which were not fair and reasonable.

25. In connection with the transactions described in paragraph 24 above, each of these respondents were credited with commissions on the transactions ... which they knew, or should have known, were excessive and while knowing, or while they should have known, that the prices being charged to customers by [First Choice] were not fair and reasonable, or while acting with reckless disregard for the fact that these commissions were excessive and the prices being charged to customers were not fair and reasonable.

26. At the time of the transactions referred to in paragraph 24 above, and under the circumstances referred to in paragraph 25 above, each of these respondents failed to disclose to their customers that the prices at which [First Choice] was selling the securities of Champion[s] Sports, Inc. to customers were not fair and reasonable.

27. The failure to disclose unfair prices to customers, as described in paragraphs 24 through 26 above, constitutes separate and distinct violations of SEC Rule 10b–5 and Article III, Sections 1, 4 and 18 of the Association's Rules of Fair Practice by respondent[ ] ... Lehl....

R. Vol. 1 at 8–9. Based on its independent review of the evidence, the SEC concluded that the "Applicants" before it, defined to include Lehl, "violated their obligations to their customers to charge fair prices pursuant [to] Sections 1 and 4" and "failed to disclose that the prices were excessive." R. Vol. 3 at 2254, 2259, 2260 n.21.

■ Our review of these findings in light of the language in the complaint convinces us that Lehl was adjudged liable for the misconduct with which he was charged. That the SEC chose to focus its opinion on pricing rather than disclosure is unremarka-

ble in this case, as pricing was the "gravamen of the complaint" against Lehl and constituted the central inquiry before the NASD committees and the SEC. *See* R. Vol. 1 at 2135, 2136–39 (NASD National Business Conduct Committee decision); *id.* at 672 (Lehl arguing at close of evidence that the "ultimate" and "most important" issue is determining prevailing market price); R. Vol. 3 at 1802 (NASD District Business Conduct Committee amended decision); *id.* at 2254–60 (SEC opinion); *cf. id.* at 2200 (Br. of Resp't Lehl before SEC) ("This is an unfair pricing case."). The complaint sets forth specific allegations of unfair pricing and defines the misconduct charged with pointed reference to the unfair pricing scheme. Moreover, Lehl never suggests that he disclosed he was charging unfair prices, shifting the analysis, himself, to whether the prices were in fact fair. *Cf.* Pet'r Br. at 16–20 (arguing prices charged were fair). Lehl's first contention fails.[3]

■ *2. The NASD Markup Policy.* Lehl next argues that the SEC never formally approved the NASD markup policy, as required for any changes in registered association rules. *See* 15 U.S.C. § 78s(b)(1). The NASD policy, which interprets Sections 1 and 4 as they relate to markups, prohibits registered representatives from entering into "any transaction with a customer in any security at any price not reasonably related to the current market price of the security." NASD Mark–Up Policy, Interpretation of the Board of Governors, *reprinted in* Resp't Br., Statutory Addendum at 4A. We have previously acknowledged the SEC's conclusion that this interpretation does no more than express what was already clearly implied in Section 1 and expressly set forth in Section 4; it does not establish a "new standard of conduct" and therefore is not a "rule change" requiring formal SEC approval. *General Bond & Share Co. v. SEC*, 39 F.3d 1451, 1459 (10th Cir.1994) (citing *In re NASD*, Exchange Act Release No. 3623, 17 S.E.C. 459, 1944 WL 976 (Nov. 25, 1944)). That principle applies here.

■ Lehl nevertheless focuses his argument specifically on a guideline within that interpretation, the so-called "5% policy."[4] He argues that the SEC employed the 5% policy as a substantive rule in this case, sanctioning him for selling Champions stock at prices exceeding 5% of the market price—even though the NASD never formally adopted the policy as a rule. We disagree with the premise of this argument. "[T]here is no hard and fast '5 percent rule' as complained of by petitioner. The Commission did not discipline him merely because his commissions were in excess of 5 per cent." *Samuel B. Franklin & Co. v. SEC*, 290 F.2d 719, 725 (9th Cir.), *cert. denied*, 368 U.S. 889,

---

3. His alternative contention that nondisclosure is consistent with §§ 1 and 4 was not urged before the SEC and is not properly before us. *See* 15 U.S.C. § 78y(c)(1); *cf.* R. Vol. 3 at 2211 (arguing before the SEC that securities regulators have failed to give notice of what constitutes adequate disclosure). In any event, Lehl correctly recognizes that charging unfair prices violates §§ 1 and 4, even if disclosed. *See* Pet'r Br. at 11; *Zero–Coupon Sec.*, Exchange Act Release No. 24,-368, 52 Fed.Reg. 15,575, 38 S.E.C. Docket 158, 1987 WL 112328, at *2 n. 8 (Apr. 21, 1987); *cf.* NASD Mark–Up Policy ("Disclosure itself … does not justify a commission or mark-up which is unfair or excessive in the light of all other relevant circumstances."), *reprinted in* Resp't Br., Statutory Addendum at 5A. The NASD appears to have framed the complaint against Lehl in failure-to-disclose terms to encompass fraud allegations, which were later dismissed. *See* R. Vol. 1 at 8–9 (charging Lehl with violation of SEC Rule 10b–5); *Zero–Coupon Sec.*, 38 S.E.C. Docket

158, 1987 WL 112328, at *2 ("Rule 10b–5 requires disclosure of excessive markups….").

4. To guide its members in determining when a price is "reasonably related to the current market price," the NASD surveyed industry pricing practices, concluding that the vast majority of transactions occurred at markups of 5% or less. It then issued guidelines setting 5% as a benchmark of reasonableness, to be considered with other relevant factors. The NASD cautioned, however, that the 5% policy "is a guide—not a rule"; that a "mark-up pattern of 5% or even less may be considered unfair or unreasonable"; and that "[i]n the case of certain low-priced securities, such as those selling below $10.00, a somewhat higher percentage may sometimes be justified." *See Handley Inv. Co. v. SEC*, 354 F.2d 64, 65 (10th Cir.1965); *Samuel B. Franklin & Co. v. SEC*, 290 F.2d 719, 725 (9th Cir.), *cert. denied*, 368 U.S. 889, 82 S.Ct. 142, 7 L.Ed.2d 88 (1961); NASD Mark–Up Policy, *reprinted in* Resp't Br., Statutory Addendum at 4A.

82 S.Ct. 142, 7 L.Ed.2d 88 (1961). Rather it found, without reference to the 5% policy, that markups of 86% and 100% over market price were unfair. A substantial body of established case law supports this determination, independent of the 5% policy. *E.g., Duker & Duker,* Exchange Act Release No. 2350, 6 S.E.C. 386, 1939 WL 1332, at *3 (Dec. 19, 1939) ("Judged by any standards," markup of 44% was "plainly excessive and unreasonable.") (pre–5% policy); *Charles Hughes & Co. v. SEC,* 139 F.2d 434, 435 (2d Cir.1943) (prices marked up 40% were "very substantially over those prevailing in the . . . market"), *cert. denied,* 321 U.S. 786, 64 S.Ct. 781, 88 L.Ed. 1077 (1944); *Samuel B. Franklin & Co.,* 290 F.2d at 725 (markups greater than 20% were clearly excessive and not reasonably related to market prices); *Costello, Russotto & Co.,* Exchange Act Release No. 7729, 42 S.E.C. 798, 1965 WL 6611, at *3 (Oct. 22, 1965) ("We have repeatedly held that markups of more than 10 percent are unfair even in the sale of low priced securities . . . ."); *cf. Robert B. Orkin,* Exchange Act Release No. 32,035, 53 S.E.C. Docket 1963, 1993 WL 89023, at *4 n. 30 (Mar. 23, 1993) (markups ranging from 16% to 100% make challenge to 5% policy "largely academic"), *aff'd,* 31 F.3d 1056 (11th Cir.1994). Lehl's attack on the 5% policy in this case fails.

■ *3. NASD Regulatory Authority.* Lehl next argues that the SEC's enforcement of the "NASD markup rules" is an improper regulation of securities prices. *See* 15 U.S.C. § 78o–3(b)(6) (rules of registered securities association may not fix rates of commissions). We disagree. As the SEC has observed in rejecting a similar contention, "[t]he NASD does not set prices, but merely requires that whatever prices its members set be fair to retail customers. As Congress has noted, this policy serves 'to protect investors against "gouging" ' and promotes just and equitable principles of trade." *Richard R. Perkins,* Exchange Act Release No. 32,188, 53 S.E.C. Docket 2442, 1993 WL 128738, at *3 (Apr. 21, 1993) (quoting S.Rep. No. 75, 94th Cong., 1st Sess. 28, *reprinted in* 1975

U.S.C.C.A.N. 179, 206) (citation corrected) (and noting further that the SEC has "rejected similar arguments before"); *see also* R. Vol. 3 at 2261 n.22 (same). In this case, the SEC did not sanction Lehl for selling securities above a certain price or for receiving commissions in excess of a fixed rate, but rather for selling securities to his customers at prices that were blatantly unfair. Lehl's attack on the NASD's regulatory authority fails.[5]

■ *4. The Champions Markups.* Lehl argues next that the SEC improperly calculated the Champions markups. The parties agree that the starting point for determining the markups is the "prevailing market price" of the stock, *see, e.g., Orkin,* 31 F.3d at 1063, but disagree as to what that price was in this case. "The general rule is that in the absence of countervailing evidence, the best evidence of prevailing market price is the dealer's contemporaneous cost. . . ." *Id.; accord Associated Sec. Corp. v. SEC,* 293 F.2d 738, 741 (10th Cir.1961). "A dealer charged with markup violations may prevent application of th[is] general rule[ ] by presenting countervailing evidence that another measure is better evidence of prevailing market price." *Orkin,* 31 F.3d at 1064.

Lehl suggests that his firm bought Champions stock at an inter-dealer concession, making cost an inappropriate indicator of market price. *See, e.g., A. Bennett Johnson,* Exchange Act Release No. 10,258, 45 S.E.C. 278, 1973 WL 12517, at *2 (June 29, 1973). To support this argument, Lehl points out that First Choice purchased Champions stock in large blocks. This evidence is wholly insufficient. Large stock purchases may indeed involve a price concession, *see id.,* but no other evidence points to one in this case, distinguishing the relevant decisions. *See id.* (inferring price concession when firm obtained stock with no active market by competitive bid in bankruptcy sale); *Strathmore Sec., Inc.,* Exchange Act Release No. 7864, 42 S.E.C. 993, 1966 WL 3112, at *2 (Apr. 8, 1966) (finding price concession in isolated

---

**5.** Lehl also refers in this portion of his brief to "anti-trust considerations." *See* Pet'r Br. at 15–16. If Lehl is claiming that the NASD rules or markup policy violate the federal anti-trust laws, we must reject his argument for failing to identify a specific federal statute he believes the NASD violated. *See Primas v. Oklahoma City,* 958 F.2d 1506, 1511 (10th Cir.1992).

transaction when seller had previously failed to move stock and firm purchased smaller blocks at nearly double the price); *Langley–Howard, Inc.,* Exchange Act Release No. 7986, 43 S.E.C. 155, 1966 WL 3140, at *5 (Oct. 26, 1966) ($2.30 per share substantially lower than $5 per share other dealers were paying in the market). The SEC refused to draw the inference that First Choice bought Champions stock at a below market price, and based on the evidence, we think properly so.[6]

Lehl also argues that the price other dealers were quoting for Champions stock is a proper measure of market price. We disagree. "[T]he use of quotations to establish the prevailing market price ... is widely recognized as problematic." *Orkin,* 31 F.3d at 1064 (citing *LSCO Sec., Inc.,* Exchange Act Release No. 28,994, 48 S.E.C. Docket 681, 1991 WL 296502, at *3 (Mar. 21, 1991); *Alstead, Dempsey & Co.,* Exchange Act Release No. 20,825, 30 S.E.C. Docket 208, 1984 WL 50800, at *2 (Apr. 5, 1984)); *see also Merritt, Vickers, Inc. v. SEC,* 353 F.2d 293, 296–97 (2d Cir.1965) (quotations appropriate as prima facie evidence of market price only absent evidence of contemporaneous cost). The SEC has "frequently pointed out" that "quotations merely propose a transaction. They do not reflect the actual result of a completed sale." *LSCO Sec., Inc.,* 48 S.E.C. Docket 681, 1991 WL 296502, at *3. The test of their reliability comes "by comparing them with actual inter-dealer transactions during the period in question." *Alstead, Dempsey & Co.,* 30 S.E.C. Docket 208, 1984 WL 50800, at *2. Lehl has submitted no evidence of this nature. Consequently, we find no error in the SEC's markup calculations.

■ *5. Lehl's Personal Accountability.* Finally, Lehl argues there is insufficient evidence in the record to demonstrate that he should be held personally responsible for any

markup violation that may have occurred. Lehl's liability in this case turns on whether he had reason to know that the markups he charged were excessive. *See, e.g., Amato v. SEC,* 18 F.3d 1281, 1284 (5th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 316, 130 L.Ed.2d 278 (1994); *Orkin,* 31 F.3d at 1065.

The record is clear that Lehl did not know the actual price First Choice paid for the stock. However, the record is equally clear that Lehl knew the firm's "strike" and "execution" prices, which differed by 30%; that he knew the 5% policy; and that he knew the firm grossed a commission on each transaction equal to 23% of each customer's investment. *See* R. Vol. 1 at 374, 376–77, 382–83.[7] This information was sufficient to put Lehl on notice that the firm was charging unfair and excessive prices. *See, e.g., Langley–Howard, Inc.,* 43 S.E.C. 155, 1966 WL 3140, at *5 (markups exceeding 10% were "clearly excessive," violating Sections 1 and 4), *cited in Amato,* 18 F.3d at 1284 ("Implicit in the [*Langley–Howard*] holding is that a registered representative could incur liability if he was on notice that the markup he was charging was excessive."); *Handley Inv. Co. v. SEC,* 354 F.2d 64, 66 (10th Cir.1965) (5% policy adequate to put NASD members on notice of obligations under Sections 1 and 4); *John G. Harmann,* Exchange Act Release No. 32,932, 55 S.E.C. Docket 58, 1993 WL 380029, at *2, *4 (Sept. 21, 1993) (gross commissions ranging upward from 16% "were clear indications to the salespeople that they needed to inquire about the propriety of the prices"); *Robert A. Amato,* Exchange Act Release No. 31,974, 53 S.E.C. Docket 1686, 1993 WL 71123, at *2 (Mar. 10, 1993) (size of commissions should have led sales representatives to. question markup, regardless of whether they knew firm's contemporaneous cost), *aff'd,* 18 F.3d 1281 (5th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 316, 130

6. Lehl's related attempt to rely on the testimony of an NASD examiner to prove a price concession yields nothing, as she testified conclusively that she did not know and did not investigate the specific arrangement between First Choice and its Champions supplier. *See* R. Vol. 1 at 298–300.

7. Additionally, Lehl testified that the Denver office posted the price that dealers were bidding for Champions stock—slightly more than 3¢ in this case—and that he believed his firm kept at

least "a good portion" of the difference between that bid price and the strike price, which in fact it did. *See* R. Vol. 1 at 376, 378–79; R. Vol. 3 at 2255 n.7 (firm kept difference between bid and strike prices); *cf. John G. Harmann,* Exchange Act Release No. 32,932, 55 S.E.C. Docket 58, 1993 WL 380029, at *2 n. 14 (Sept. 21, 1993) ("[T]he salespeople could not reasonably have believed that the firm's cost exceeded the strike price.").

L.Ed.2d 278 (1994).[8] Lehl's decision to ignore those warning signs makes NASD sanctions against him appropriate.

We are unimpressed with Lehl's attempt to minimize his involvement in the Champions affair to the point of no responsibility. The SEC gave Lehl the benefit of the doubt for his inexperience by dismissing fraud charges against him, despite markups large enough to support a fraud finding. *See James E. Ryan,* Exchange Act Release No. 18,617, 24 S.E.C. Docket 1716, 1982 WL 32453, at *3 (Apr. 5, 1982) ("We have repeatedly held that, generally, markups of more than 10% are fraudulent, even in the sale of low priced securities.") (footnote omitted). Lehl's position as a registered securities representative required him to understand the basis for the prices he was charging the public and to assure himself those prices were fair. This he failed to do.

For the foregoing reasons, we AFFIRM the order of the SEC.

---

**8.** While high commissions themselves do not necessarily produce unfair prices, they are "strong indicia of unfair pricing—which must be investigated." *Richard R. Perkins,* 53 S.E.C. Docket 2442, 1993 WL 128738, at *3 n. 18. Lehl undertook no investigation of any kind in this case, obviating the need here to further define the contours of the required investigation.